THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. HOLLY BASKINS-SPEARS, Defendant-Appellee.

First District (6th Division)   No. 1—01—2382

Opinion filed February 14, 2003.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Kenneth T. McCurry, Ann Benedek, and Rimas Cernius, Assistant State's Attorneys, of counsel), for the People.

R. Eugene Pincham, of Chicago, for appellee.

JUSTICE GALLAGHER delivered the opinion of the court:

Defendant was charged with criminal drug conspiracy and possession of a controlled substance with intent to deliver (cocaine) from an arrest on March 29, 1999, after officers discovered 30 kilograms of cocaine in defendant's vehicle while conducting a traffic stop. Following a hearing, the trial court granted defendant's motion to suppress evidence on April 25, 2001. On appeal, the State contends that the trial court's ruling was manifestly erroneous in that the police had probable cause to search defendant's vehicle without a warrant due to a reasonable belief that defendant was transporting narcotics.

Although defendant has not filed a brief on appeal, we will consider the appeal under the principles set forth in *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 131-33, 345 N.E.2d 493, 494-95 (1976). We reverse the trial court and find that the police had probable cause to stop defendant and conduct a search of her vehicle based on the information gathered from a lengthy narcotics investigation of defendant and several other suspects.

The State asserts that the police investigation revealed that defendant was involved in a narcotics distribution ring with Keith Presley. Due to the circumstances of this case, a full recitation of the lengthy investigation is necessary.

### November 24, 1998

Chicago police officer Timothy Cerven testified that on November 24, 1998, he and Investigator Thomas Martin were conducting surveillance of Keith Presley at 10025 South May Street in Chicago pursuant to an investigation by the State's Attorney's narcotics strike force. Cerven and Martin were in separate vehicles. Cerven testified that throughout the afternoon he observed several persons going back and forth from their cars to the house.

At approximately 7:20 p.m., several men removed a Tide soap box from the trunk of a purple Nissan and carried it into the residence. At 7:39 p.m. Cerven observed a black, two-door Ford Explorer park in front of the residence. The license plate on the Explorer was registered to defendant. Cervan stated that a woman exited the car and removed two large Tide soap boxes, approximately two feet by two feet, from the rear hatch of the vehicle. The woman then walked with the two Tide boxes, one under each arm "like they were light," into the residence. At 8:09 p.m., the woman and a man exited the house. The man carried a Tide box in each hand. Cerven testified that the Tide boxes seemed to be "heavier than when they went in," because the man appeared to struggle as he walked with the boxes. The man placed the two boxes in the rear hatch of the Explorer and the woman drove away alone. Cerven remained at the residence while other officers followed the Explorer. On cross-examination, Cerven stated that although he has been shown pictures of defendant numerous times since November 24, he has not identified her as the woman he saw at 10025 South May.

Martin testified that he was approximately 15 feet from the Explorer when he observed the woman and the man putting the boxes in the vehicle. Martin followed the woman driving the Explorer to Effingham, Illinois, until she drove to Interstate 70 and headed toward St. Louis, where the surveillance was terminated. In court, Martin identified defendant as the woman he saw on November 24, 1998.

## December 30, 1998

Martin also testified to surveillance conducted on December 30, 1998, at 1241 East 168th Street in South Holland, Illinois. The surveillance was also part of the narcotics investigation of Presley. At approximately 1:50 p.m., Martin observed a maroon, four-door Ford Explorer pull up to the house. The maroon Explorer was registered to Elix Duncan. Martin saw a man that he later identified as Duncan get out of the vehicle and go into the residence with a small object in his hands. A short time later the man returned to the Explorer, retrieved a plastic bag that had some kind of brick-shaped object in it, and walked back into the house.

While Martin was at the East 168th Street address, other officers were conducting surveillance at the 10025 South May Street address. These officers radioed Martin at 2:15 p.m. and advised him that a man had arrived at the South May Street address in a gray Jaguar. The man opened the trunk of the Jaguar, took out a large gym bag, walked across the street to a green Honda and put the bag in the Honda's trunk. The man then got into the Honda and drove to the Calumet Expressway, where officers terminated their surveillance. Approximately five minutes later, Martin observed the green Honda pull into the driveway at 1241 East 168th Street. After the driver sounded the horn, the garage door went up, the Honda pulled into the garage, and the garage door closed. The Honda pulled out of the garage about 20 minutes later. Martin testified that when the Honda pulled out of the garage there was a box in the front passenger seat that was not there when the Honda first pulled into the garage.

At that time, Cerven was conducting surveillance at a strip mall on 159th Street. Martin radioed Cerven that the Honda left East 168th Street with a box in the front seat. Cerven then saw the Honda pull into the strip mall parking lot and park next to a maroon Mazda. The driver of the Honda and the driver of the Mazda transferred the box to the Mazda. When both cars left, Cerven and other officers followed the Mazda. The other officers stopped the Mazda on Bishop Street near the 111th Street exit on Interstate 57 south. Cerven returned to his surveillance at 159th Street. Thirty kilograms of cocaine were found in the box in the Mazda The driver of the Mazda was identified as Christopher Trammel. The driver of the Honda was later identified as Keith Presley. Presley was not arrested at this time.

At approximately 3 p.m., Martin observed the Honda return to the East 168th Street address and enter the garage. Around 3:30 or 3:45 p.m., the garage door opened and Duncan backed his maroon Explorer into the garage. Martin saw several industrial-sized soap boxes inside the garage. Duncan opened the rear hatch of the Explorer and Martin

observed "some type of activity" behind Duncan's vehicle. Duncan then closed the hatch and drove away, heading east on 168th Street.

After receiving a radio alert that Duncan left East 168th Street, Cerven observed Duncan's Explorer at 159th Street and Woodlawn Avenue and he followed the Explorer. The Explorer parked next to a black GMC Jimmy, and Duncan went into the GMC. When Cerven approached the GMC from the passenger window, he observed a drug transaction between Duncan and Kenneth Dunlap, the driver of the GMC. Duncan was placed under arrest. During the arrest, Cerven discovered several gym bags in the rear hatch of Duncan's Explorer filled with kilograms of cocaine. The Explorer was seized and forfeited, and a notice of forfeiture was sent to Duncan. Cerven stated that 65 kilograms of cocaine were recovered from the Explorer.

Based on all of the surveillance, it was determined that the kilograms of cocaine found in the vehicles of Trammel and Duncan came from the 1241 East 168th Street address. Chicago police officer William Kappel obtained a search warrant for the East 168th Street residence, and police recovered 1,041 grams of cocaine, 666 grams of heroin and 33.6 grams of cannabis. Officers also found bottles of Procaine, which is a dilutant for cocaine, and packets of Manitol, a dilutant for heroin. In the garage, officers found a hydraulic press that was reconfigured to compress three kilograms of cocaine at a time, along with a scale and numerous large boxes of laundry detergent. Other than the cited drugs and drug paraphernalia, the house was unfurnished. Kappel testified that, based on his police experience, the house was being used as a repackaging facility for narcotics. Kappel further learned through the investigation that Keith Presley had paid $14,000 and $17,000 in cash to the owner of the East 168th Street house as rent for 1997 and 1998, respectively.

### February 17, 1999

Chicago police officer Robert Cordaro testified that on February 17, 1999, he observed a man identified as Terrance Robinson meet Presley at the South May Street address. Robinson had been seen by other officers minutes before at 1400 West 103rd Street. Cordaro observed Presley and Robinson leave the residence. Presley got into his blue Range Rover, and Robinson got into a light blue Ford Escort. Cordaro followed Presley and arrested him after learning that Presley had an outstanding warrant for driving on a revoked driver's license. Cordaro found $23,000 on Presley's person, a loaded semi-automatic .45-caliber pistol in the car and the notice of forfeiture which was sent to Elix Duncan when his vehicle was seized on December 30, 1998. After taking Presley and the evidence from his car to the police sta-

tion, the police called a canine unit to sniff the money found on Presley to alert for the odor of narcotics. Cordaro testified that the dog positively alerted on the money that had been recovered.

## March 1, 1999

Cordaro also testified regarding his surveillance of 1400 West 103rd Street on March 1, 1999. Cordaro observed Robinson meet a woman later identified as defendant in her Explorer. Defendant and Robinson parked their cars in the rear of the building and Robinson transferred a box from his Ford Escort to the Explorer. Defendant left, and Cordaro followed the Explorer to Interstate 94 past the Michigan City exit.

## March 29, 1999

Chicago police officer Cesar Echeverria testified that on March 29, he and Officer Angel Lorenzo were conducting surveillance at 1040 Ontario Street in Oak Park, Illinois, which was believed to be defendant's residence. At 8:10 p.m. Echeverria followed defendant in her Explorer from the residence to a McDonald's restaurant located on Ontario Street and Ohio Street between LaSalle and Clark Streets in Chicago. Approximately 20 minutes later, a blue Range Rover drove up to the McDonald's. Echeverria stated that the Range Rover was driven by Keith Presley. Defendant followed Presley's vehicle on Ontario Street.

Echeverria and Lorenzo followed the vehicles to a strip mall where defendant and Presley switched cars and drove out of the strip mall parking lot. A short time later, officers observed defendant in the parked Range Rover on 56th Street. The Explorer was no longer in the same proximity as the Range Rover, and for that period of time, officers were unaware of Presley's whereabouts. At 9:40 p.m., officers observed Presley drive the Ford Explorer. into an alley next to where defendant was sitting in the Range Rover. After speaking briefly, defendant and Presley went to their original vehicles and pulled out to drive northbound on Kedzie Avenue.

Chicago police officer Mike Conley and Chicago police officer Darryl Reum followed Presley and defendant north on Kedzie Avenue. Conley observed defendant drive through a red light at 38th Street and Kedzie Avenue while following Presley. Defendant then turned from Kedzie Avenue onto Interstate 55, headed north to Lake Shore Drive, and drove northbound on Lake Shore Drive. Presley continued to drive northbound on Kedzie Avenue. The officers conducting surveillance all followed defendant. Conley testified that, because of construction on Interstate 55, they effectuated a traffic stop of the Explorer on Lake Shore Drive after they passed the construction area. Due to the

traffic congestion on Lake Shore Drive and their close proximity to passing cars, Conley approached the Explorer and asked defendant to follow him down the ramp to 18th Street.

Once at 18th Street, defendant was asked to walk to the back of the vehicle and Conley informed her that she was stopped for going through the red light and as part of a narcotics investigation. As Conley spoke to defendant, Reum shone his flashlight into the Explorer and looked in the rear window. Reum indicated to Conley that he observed something inside the back of the Explorer. Conley testified that he observed a cardboard box containing rows of packages wrapped with yellow rubber mylar. Conley recognized these packages to be packages of cocaine. When asked to explain how he saw the contents of the box, Conley testified as follows:

"A. The flap towards the back seat had a bend in it. The other two—the flap that would be at the very back of the hatch part.

Q. Yes.

A. Was down. The two flaps from the side were down, but there was still a space I want to say three inches by about eight inches, that they did not all meet in the middle.

Q. What were you able to see through that space?

A. I was able to see the edges of what I believed to be kilos inside there."

Defendant refused to sign a consent to search form. Reum told defendant that although she was free to leave, the vehicle had to remain at the location because they were calling a canine narcotics unit to search the vehicle. Defendant chose to stay with her vehicle and sat in the back of the police car. Conley stated that defendant was not handcuffed while in the police car, and she made several cell phone calls when she was in the car. Conley testified that no officers searched defendant's vehicle prior to the canine search.

When the canine unit arrived 40 minutes later, the dog alerted positively to the scent of narcotics and defendant was arrested. Conley then visually examined the contents of the box and found what appeared to be numerous kilograms of cocaine. Once at the police station, officers found a plastic bag in the Explorer that contained an additional eight kilograms of suspected cocaine. In defendant's purse, officers discovered blank money orders in different denominations totaling $17,500.

Chicago police officer Joseph Ozga, the officer in charge of the canine unit, testified that when he directed the dog to the interior of the vehicle, it went to the back area of the Explorer and began scratching and biting at a cardboard box. On cross-examination, Ozga stated that there was a blanket covering the box which was removed as the

dog was scratching at the box. Ozga stated that although the dog may have opened the top of the box when she bit at it, he was unable to see its contents because the flaps were over the box.

Defendant testified that the officers told her they pulled her over because she had been driving erratically, and they ordered her to step out of the car. Defendant stated that the police told her they were going to search her vehicle and asked her to sign a consent form while they were still on Lake Shore Drive. When defendant refused, the police told her to get back in her car and follow them. Once they drove down the ramp to 18th Street, the police told her to get out of her car and then escorted her to the police car behind the Explorer. She further stated that the police opened her trunk and began searching her car before the canine unit arrived and that she was never told she was free to leave.

Defendant acknowledged that she knew Presley, met him and followed him, and that they switched cars and switched back again on March 29. Defendant said Presley did not show her the back of her truck before she got back into her Explorer and drove onto Kedzie, and she did not know if there was a box in the back of her truck when she left her house earlier that day. Defendant denied going through a red light at 38th Street.

Defendant stated that she did not remember if she had been to Presley's home at 10025 South May Street on November 24, 1998. She further stated that she does not remember what she did on March 1, 1999, and she was not familiar with the address of 1400 West 103rd Street. Although she stated that she knows Robinson, she denied that she and Robinson put anything into her truck on March 1 or that she drove her truck to Indiana or Michigan.

Following the testimony, the trial court stated that it had to analyze the circumstances surrounding all of the dates before defendant was stopped and that "there were important facts and circumstances on the date that she was stopped and the narcotics were confiscated, that may affect what the police testified to on the previous dates and times." The court found it "unusual" that the police stopped defendant on Lake Shore Drive and Interstate 55 when she disobeyed the red light at 38th Street and Kedzie Avenue. The court also questioned why the officers called the canine unit when they saw what they believed to be narcotics in plain view. According to the court, Conley and Ozga's contradictory testimony regarding whether the contents of the box were in plain view "affects their believability and credibility throughout what they did and the entire testimony of how this investigation took place."

The court then questioned why the officers did not stop defendant

after following her down to southern Illinois on November 24 if they believed she was transporting narcotics. It also stated that, contrary to the State's suggestion, there was no reasonable inference that the boxes which officers observed being transferred between automobiles contained narcotics simply by "how they were packaged, how they were handled, and the testimony surrounding those boxes." Finding defendant to be more credible, the court granted defendant's the motion to suppress.

## ANALYSIS

■ In making the argument that the trial court's decision was manifestly erroneous, the State focuses on the events that occurred prior to the search of defendant's Explorer on March 29. The State contends, and we agree, that the March 29 detention was reasonable due to specific facts obtained that supported the belief that defendant was transporting narcotics for Presley. When a motion to suppress evidence involves factual determinations or credibility assessments, the reviewing court must give due weight to the inferences drawn from those facts and shall reverse the trial court's ruling only if it is manifestly erroneous. *People v. Love*, 199 Ill. 2d 269, 274, 769 N.E.2d 10, 14 (2002). However, when an appellate court reviews a ruling on a motion to suppress involving a question of probable cause or reasonable suspicion, the reviewing court should review *de novo* the ultimate finding with respect to probable cause or reasonable suspicion. *People v. Boomer*, 325 Ill. App. 3d 206, 209, 757 N.E.2d 960, 963 (2001), citing *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). On a motion to suppress evidence, the defendant has the burden of showing that the search and seizure were unlawful. *People v. Ortiz*, 317 Ill. App. 3d 212, 219, 738 N.E.2d 1011, 1018 (2000).

Initially, we disagree with the trial court's conclusion that the officers' testimony as to defendant's stop was "divergent" or "contradictory." Ozga's testimony that he was unable to see the contents of the box does not contradict Conley's testimony to the extent that it was "severely impeached" and therefore unbelievable, as suggested by the trial court. We further find the location of the stop on Lake Shore Drive to be irrelevant as it relates to the witnesses' credibility. The testimony is consistent that defendant turned right onto Interstate 55 immediately after going through the intersection of 38th Street and Kedzie Avenue. No evidence was presented to contradict Conley's testimony that the construction on Interstate 55 presented difficulties in executing the traffic stop. Hence, there is nothing to suggest that the decision to stop defendant on Lake Shore Drive after she exited

Interstate 55 was improper. Despite our assessment of the trial court's credibility findings, however, our decision to reverse rests on our disagreement with the court's legal conclusion that the police lacked a reason to stop defendant and search her vehicle.

■ A police officer is permitted to make a limited stop of an individual when the officer has a reasonable, articulable suspicion that a crime has been committed or is about to be committed. *People v. Hamilton*, 251 Ill. App. 3d 655, 660, 622 N.E.2d 130, 134 (1993), citing *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). One must look to the totality of the circumstances in determining whether the officer had a reasonable belief that a person is involved in criminal activity. *People v. Avant*, 331 Ill. App. 3d 144, 151, 771 N.E.2d 420, 426 (2001). The whole picture must be taken into account. *Avant*, 331 Ill. App. 3d at 151, 771 N.E.2d at 426.

In granting the motion to suppress, it appears that the trial court considered the events of March 29 in isolation, although extensive testimony was heard regarding a four-month narcotics investigation that continued up until the police stopped defendant. At the time of the stop, officers had reason to believe that Presley was the head of an organized narcotics ring and that Duncan, Robinson and defendant assisted Presley in the distribution and sale of narcotics. The factors which corroborate this belief are numerous: (1) the surveillance of the addresses of 10025 South May Street and 1241 East 168th Street suggesting illegal drug activity; (2) the transfer of 30 kilograms of cocaine from Presley to Trammel on December 30; (3) the drug transaction between Duncan and Dunlap and the subsequent seizure of 65 kilograms of cocaine from Duncan's vehicle; (4) the discovery of Duncan's notice of vehicle forfeiture in Presley's Range Rover; (5) the discovery of a large amount of narcotics at the East 168th Street address where the police determined narcotics were being repackaged and found large soap boxes inside the garage; (6) a man loading large, heavy soap boxes from Presley's home into defendant's car on November 24; (7) the suspicious activity between Robinson and defendant on March 1 that appeared to be a drug transfer into defendant's vehicle; and (8) the surveillance on March 29, where officers observed defendant meet Presley and transfer vehicles, presumably for Presley to pick up narcotics at an unknown location and then arrange for defendant to drive the narcotics to a specific destination. The above facts show a clear connection between Presley and defendant.

The facts also support the officers' suspicion that the exchange between Presley and defendant involved drugs. When the officers stopped defendant, almost 100 kilograms of cocaine had been

confiscated from individuals associated with Presley. Officers first observed Trammel receive 30 kilograms of cocaine directly from Presley. Subsequently, Duncan was arrested with 65 kilograms of cocaine after police observed him leave the 168th Street address with several gym bags in the rear hatch of the Explorer. An examination of the facts reveals that this cocaine also came from Presley. Therefore, when officers on March 29 observed defendant engaging in similar conduct with Presley, they had reason to suspect that a narcotics transfer had occurred and that defendant was transporting narcotics. Taken as a whole, these events are more than sufficient to warrant suspicion of criminal activity by defendant, thereby justifying the stop.

■ Because we find that the police had reason to suspect that defendant was trafficking narcotics on March 29, the search of her vehicle was proper. A warrantless search of a vehicle is proper where police have probable cause to believe it contains contraband. *People v. Jackson*, 331 Ill. App. 3d 158, 162, 772 N.E.2d 275, 279 (2002). As with an investigatory stop, we look to the totality of the circumstances to determine whether probable cause exists. *Jackson*, 331 Ill. App. 3d at 162, 772 N.E.2d at 279. The observations and evidence collected from November 24, 1998, until the exchange with Presley on March 29, 1999, gave the police sufficient reason to believe that defendant's vehicle contained contraband on March 29. Therefore, they executed a lawful search of her vehicle.

The trial court made clear determinations of credibility in favor of defendant. While we question some of its reasoning, we do not intend to disturb those findings. However, even were we to accept defendant's version of the events as true, ample uncontroverted evidence, considering the totality of the circumstances, justified the officers' stop. Accordingly, we conclude the trial court erred in finding that the police lacked probable cause to conduct the search and seizure.

For the aforementioned reasons, the judgment of the trial court is reversed. The cause is remanded for proceedings consistent with this opinion.

Reversed and remanded.

O'BRIEN, P.J., and TULLY, J., concur.