THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. KIM DeWAYNE AUSTIN, Defendant-Appellee.

Fourth District   No. 4—04—0727

Argued March 21, 2006.—Opinion filed May 1, 2006.—Rehearing denied June 16, 2006.

Julia Rietz, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Bi-

498

derman, and Kathy Shepard (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

Daniel D. Yuhas and Michael Delcomyn (argued), both of State Appellate Defender's Office, of Springfield, for appellee.

PRESIDING JUSTICE TURNER delivered the opinion of the court:

In February 2003, the State charged defendant, Kim DeWayne Austin, with one count of unlawful possession with intent to deliver a controlled substance. In May 2003, defendant filed a motion to suppress evidence, which the trial court denied. In July 2004, defendant filed a motion for rehearing. In August 2004, the court granted the motion to suppress.

On appeal, the State argues the trial court erred in granting defendant's motion to suppress. We reverse and remand for further proceedings.

## I. BACKGROUND

In February 2003, the State charged defendant by information with one count of unlawful possession with intent to deliver a controlled substance (720 ILCS 570/401(a)(2)(B) (West 2002)), alleging he knowingly and unlawfully possessed with the intent to deliver 100 grams or more but less than 400 grams of a substance containing cocaine. Defendant pleaded not guilty.

In May 2003, defendant filed a motion to suppress evidence, alleging police officers did not have probable cause to believe he was committing a crime or about to commit a crime prior to searching him and seizing evidence. In July 2003, the trial court conducted a hearing on the motion.

Rantoul police detective Alex Meyer testified he met with a confidential source in August 2002, who provided information concerning an individual known by the street name "Mafia." The informant indicated Mafia sold crack cocaine in Rantoul and once had reported a burglary of his apartment where $2,700 was taken. The informant stated the $2,700 had not been taken but instead a large sum of crack cocaine was taken. The residence burglarized belonged to defendant, and his street name was Mafia.

In the later months of 2002 and early part of 2003, Detective Meyer investigated drug dealing at 409 Sheldon in Rantoul. A different confidential source identified defendant as selling large amounts of crack cocaine in Rantoul. The source stated defendant worked with an individual named "Sean," who was identified as Andre Strong. The source indicated defendant's narcotics were the majority of drugs sold from 409 Sheldon and Juniper Drive, where Strong resided.

On February 19, 2003, Detective Meyer received information from an anonymous source that a man named Martiez Young, dressed in a black Raiders hat and black coat and carrying a blue duffel bag, would be arriving in Rantoul from Kankakee via Greyhound bus. Young was to be carrying several ounces of crack cocaine to be given to Strong. To check on the reliability of the anonymous information, Detective Meyer called a confidential source who stated Young frequented 409 Sheldon, recently moved to Rantoul from Kankakee, wore all black, and matched the description.

At about 4:50 p.m., Detective Meyer saw two men exit the Greyhound bus after it stopped in Rantoul. The two men were talking to each other and turned to walk east along the side of the bus. Meyer approached the men from behind and identified himself as being a detective with the Rantoul police department. One man continued to walk east while the other, later identified as defendant, "took two steps to walk back towards [Meyer's] right." Defendant's "evasive movement" appeared to Meyer that defendant "definitely did not want to be in [the detective's] presence." Meyer described the movement as "two steps similar to a military about-face[,] [a] quick two steps [in the] opposite direction." Meyer then said he needed to speak with both men. He also asked another officer to assist him. Meyer did not know defendant's identity at that time. He then asked both men to put their hands on the bus as he stood behind them.

Detective Meyer asked both individuals to identify themselves. When Meyer stopped defendant and Young, "it was seconds" before defendant told him his name, and once defendant gave his name, Meyer knew who he was. Other officers moved Young to the rear of the bus. Based on his training and experience, Meyer was concerned about his safety, knowing defendant had been previously arrested for unlawful discharge of a weapon and unlawful use of a weapon. Further, Meyer described defendant as "a large individual" who outweighed him "by several pounds." Meyer then patted down defendant for weapons and felt an object in his coat pocket. Meyer asked three times what the object was, and defendant finally answered the third time that the object " 'must be potato chips.' " Meyer secured defendant because he had become "very quiet and was looking down the road." Based on his experiences, Meyer believed defendant's manner indicated a possible intention to flee or fight.

Meyer stated other officers found a large sum of cash on Young's person. Thereafter, both men were transported to the police department. During the booking process, Meyer removed a brown bag of suspected crack cocaine from defendant's pocket.

On cross-examination, Meyer stated the two men exited the bus

and were talking to each other as they walked away. Meyer testified the two men appeared to be together, and he decided to stop them after identifying himself as a police officer and defendant's attempt "to evade and separate himself from Mr. Young."

Rantoul police sergeant Randy Davis testified defendant was stopped before his identity had been discovered. Davis patted down Young and found a large amount of cash in his pocket.

The trial court denied the motion to suppress. The court found, in part, as follows:

"When Investigator Meyer identified himself, it wasn't that [defendant] walked away. Officer Meyer described it as almost like an about-face as one would do when marching or drilling. It was an abrupt turn and walking away on an angle. Prior to that, he was talking with Mr. Young. It was obvious that they were together, and it was only after Investigator Meyer identified himself that the [d]efendant abruptly changed directions and began to separate himself. Again Investigator Meyer was candid. He stopped him at that point. There's no doubt about it. The [d]efendant was stopped. He was detained, asked to face the bus along with Mr. Young.

Given the time frame involved[,] we're probably talking about 5, 10, 15 seconds before Investigator Meyer made the determination that [defendant] was the second individual, was the other person with Mr. Young.

Granted he was detained. Granted it was for about 10 to 15 seconds before his identity was determined and once his identity was determined then all of the other pieces fell into place. ***

Is that an unreasonable stop? Was there reasonable articulable suspicion to detain this [d]efendant even for those brief seconds? Well, again, they were expecting Young. They were expecting Young on the bus with a load of cocaine. The [d]efendant gets off the bus with Young. They knew as far as this investigation is concerned that there are three people who were named by the officers, Mr. Young, [defendant], and then the third person I believe was referred to as Sean. They know that this [d]efendant—that Mr. Young was going to deliver the cocaine in question; and when the [d]efendant abruptly did an about-face, literally an about-face, and began distancing himself from the officer, Officer Meyer asked him to stop. I don't believe that is an inappropriate action on the part of the officer. I believe that there was reasonable articulable suspicion to at least determine who he was. And the brief stop before the identification was basically so *de minimis* that I don't believe that if it was a violation it was such that it would [have] involved the [d]efendant's constitutional right."

In July 2004, defendant filed a motion for rehearing, alleging the

bus driver was in a position to see the stop and search and may have evidence to offer in contradiction to the police. The trial court took the motion under consideration while it conducted defendant's bench trial. Sergeant Davis offered essentially the same version of events as he did at the motion hearing.

Rantoul police officer James Sullivan testified he assisted in the investigation of suspected drug suspects exiting a Greyhound bus. Sullivan parked behind the bus and saw Detective Meyer and Sergeant Davis with two black male subjects next to the bus. Meyer started patting down one of the subjects and asked him about the item in his pocket. Sullivan stated he heard the man say he thought it was potato chips or a bag of chips. Detective Meyer finished the pat-down search and asked Sullivan to handcuff defendant.

As a witness for the defense, James Wakeford testified he drove the Greyhound bus on February 19, 2003. After stopping in Rantoul, Wakeford noticed two men exit the bus. He opened the luggage bin on the passenger side of the bus to retrieve luggage for one of the men. He remembered somebody dressed in civilian clothes approaching from the back of the bus. Wakeford soon realized "they were police" and "trying to get or arrest somebody." When asked if the plainclothes officer went right up to the man he put up against the bus, Wakeford said he "pretty much went directly to that person." Wakeford testified he would have been unable to see behind him while in the luggage bin. When asked if he recalled the officer saying anything when the officer first approached, Wakeford responded, "No not really. I don't remember anything." Wakeford was unable to specifically describe what occurred as Meyer approached. As to the actions of the passengers, Wakeford testified, "I don't remember anybody like trying to run down the sidewalk anywhere or nothing. No, they weren't trying to run away."

Detective Meyer offered testimony similar to that given at the motion hearing. He stated two individuals exited the bus and started walking alongside it. He identified himself, and one man made "a military about-face" and "immediately tried to go opposite of the first individual." Meyer had both men put their hands on the bus and asked them their names. Upon patting down defendant, Meyer said he "appeared extremely nervous" and said the object in his pocket was potato chips.

On cross-examination, Meyer stated he would not have stopped defendant if he exited the bus by himself. Instead, Meyer stopped defendant because after Meyer identified himself, defendant "made a movement immediately to separate himself from Mr. Young." Meyer stated he did not see the bus driver outside the bus until after he

made contact with the men. Meyer did not see any luggage and the only bag he picked up was the one Young carried off the bus on his person.

Defendant testified the bus driver exited first, followed by Young, and then himself. The driver then searched the luggage compartment for Young's bag. Defendant stated Young retrieved his bag and walked off while defendant waited for a ride. Police officers then pushed him toward the bus. Defendant stated one officer radioed another to get the other individual. Meyer then patted him down and placed him in a patrol car.

The trial court then ruled on the motion to suppress, stating, in part, as follows:

> "Did Officer Meyer have reasonable, articulable suspicion to search or pat this [d]efendant down for, ostensibly, weapons? The *Ebara* case tells us, that it's not the *Terry* stop as, you know, a temporary stop and search. The requirements are separate for the stop, and for any subsequent search. So at that point in time, we had a [d]efendant who police did not recognize, was stopped because once Officer Meyer acknowledged or announced his presence, separated himself from the other individual, the target of their investigation. Was then put alongside the bus and patted down for weapons. And I think the question, the comment was 'for officer safety.' Under these circumstances, it would be nice if the police could always pat individuals down to make sure they were not carrying weapons. We're in a dangerous time. But I don't believe that's what the constitution allows. I don't believe that's what the cases allow us to authorize. I don't believe at the time this [d]efendant was stopped, at the time he was put on the bus, at the time he was patted down, that the officer had reasonable, articulable suspicion that he was either involved in criminal activity, or more importantly, was in any way, shape[,] or form armed."

The court granted the motion to suppress. The State filed a certificate of impairment. This appeal followed.

## II. ANALYSIS

The State argues the trial court erred in granting defendant's motion to suppress. We agree.

### A. Standard of Review

■ In reviewing a motion to suppress on appeal, we are presented with mixed questions of law and fact. *People v. Smith*, 214 Ill. 2d 338, 347, 827 N.E.2d 444, 450 (2005). A trial court's factual determinations and assessment of witness credibility will be reversed on appeal only if manifestly erroneous. *People v. Ramsey*, 362 Ill. App. 3d 610, 614, 839 N.E.2d 1093, 1097 (2005). The ultimate determination of whether the

evidence is suppressed, however, is entitled to *de novo* review. See *People v. Nicholas*, 218 Ill. 2d 104, 116, 842 N.E.2d 674, 681-82 (2005).

## B. The Stop

The fourth amendment to the United States Constitution guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV. Similarly, the Illinois Constitution affords citizens with "the right to be secure in their persons, houses, papers[,] and other possessions against unreasonable searches[ ] [and] seizures." Ill. Const. 1970, art. I, § 6. The protection against unreasonable searches and seizures under the Illinois Constitution is measured against the same standards articulated by the United States Supreme Court in its fourth-amendment jurisprudence. *Smith*, 214 Ill. 2d at 349, 827 N.E.2d at 451.

■ "The Fourth Amendment applies to all seizures of the person, including seizures that involve only a brief detention short of traditional arrest." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 614, 95 S. Ct. 2574, 2578 (1975). For a search or seizure to be deemed reasonable, the fourth amendment generally requires a warrant supported by probable cause. *People v. Cox*, 202 Ill. 2d 462, 466, 782 N.E.2d 275, 278 (2002). However, the United States Supreme Court recognized an exception to the warrant requirement in *Terry v. Ohio*, 392 U.S. 1, 22, 20 L. Ed. 2d 889, 906-07, 88 S. Ct. 1868, 1880 (1968), stating a police officer may stop and detain a person for temporary questioning, absent probable cause to arrest, if the officer has a reasonable and articulable suspicion the person is committing, has committed, or is about to commit a crime. The General Assembly has codified the temporary-questioning-without-arrest aspect of *Terry* in section 107—14 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/107—14 (West 2004)), in part, as follows:

> "A peace officer, after having identified himself as a peace officer, may stop any person in a public place for a reasonable period of time when the officer reasonably infers from the circumstances that the person is committing, is about to commit[,] or has committed an offense as defined in [s]ection 102—15 of this Code, and may demand the name and address of the person and an explanation of his actions."

■ The validity of an investigatory stop is a separate question from whether a search for weapons is valid. *People v. Flowers*, 179 Ill. 2d 257, 263, 688 N.E.2d 626, 629 (1997).

> "The conduct constituting the stop under *Terry* must have been justified at its inception. A court objectively considers whether, based on the facts available to the police officer, the police action

was appropriate. To justify the intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences therefrom, reasonably warrant that intrusion. [Citations.]

\*\*\*

\*\*\* Viewed as a whole, the situation confronting the police officer must be so far from the ordinary that any competent officer would be expected to act quickly. The facts supporting the officer's suspicions need not meet probable[-]cause requirements, but they must justify more than a mere hunch. The facts should not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her." *People v. Thomas*, 198 Ill. 2d 103, 109-10, 759 N.E.2d 899, 902-03 (2001).

In the case *sub judice*, Detective Meyer testified he had received information concerning three individuals and their involvement in the sale of crack cocaine in Rantoul. Meyer learned defendant worked with Strong, and Young was to arrive by bus in Rantoul to deliver several ounces of crack cocaine to Strong. Based on his training and experience, Meyer stated individuals involved in the narcotics trade often work in groups. When the bus stopped, two men exited and Meyer noticed a man matching the source's description of Young. Meyer stated the two men appeared to know each other and talked as they walked alongside the bus. After Meyer identified himself as a police officer, the man with Young made an "evasive movement" like "a military about-face." Meyer stated the man moved to separate from Young immediately after Meyer identified himself.

When initially denying the motion to suppress, the trial court found it "was obvious" Young and defendant were together and defendant abruptly changed direction to separate himself from Young after Meyer announced his presence. The court stated the officers were expecting Young on the bus with a load of cocaine. However, their investigation indicated three individuals were involved in dealing cocaine in Rantoul. When two individuals exited the bus and defendant did "an about-face," the court initially found Meyer had a reasonable and articulable suspicion to justify stopping not only Young, but also defendant "to at least determine who he was."

In determining whether a police officer had a reasonable belief that a person is involved in criminal activity, one must look at the totality of the circumstances. *People v. Baskins-Spears*, 337 Ill. App. 3d 490, 499, 785 N.E.2d 983, 990 (2003). "[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119,

125, 145 L. Ed. 2d 570, 577, 120 S. Ct. 673, 676 (2000). Thus, "[t]he whole picture must be taken into account." *Baskins-Spears*, 337 Ill. App. 3d at 499, 785 N.E.2d at 990.

■ Here, the police were justified in stopping defendant. The officers believed Young would be carrying crack cocaine to be delivered to Strong. When Young exited the bus, he was walking and talking with another man. The officers knew other individuals were involved in dealing drugs in Rantoul. When Meyer identified himself, defendant changed direction to separate himself from Young and gave rise to a reasonable suspicion that he may be involved in criminal activity. See *Wardlow*, 528 U.S. at 124, 145 L. Ed. 2d at 576, 120 S. Ct. at 676 ("evasive behavior is a pertinent factor in determining reasonable suspicion"). Although a "quick two steps" in the opposite direction might not be considered "flight" or "headlong flight," *i.e.*, the sprinting variety, such a movement, taken into consideration with the other facts known to Detective Meyer, was sufficient to justify the minimal intrusion of a *Terry* stop to allow Meyer to investigate further. A competent officer, confronted with these facts and expected to act quickly, would be justified in stopping defendant and investigating the situation further. See *Wardlow*, 528 U.S. at 125, 145 L. Ed. 2d at 577, 120 S. Ct. at 676 ("Allowing officers confronted with such flight to stop the fugitive and investigate further is quite consistent with the individual's right to go about his business or to stay put and remain silent in the face of police questioning"); see also *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177, 186, 159 L. Ed. 2d 292, 303, 124 S. Ct. 2451, 2458 (2004) (" 'A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time' "), quoting *Adams v. Williams*, 407 U.S. 143, 146, 32 L. Ed. 2d 612, 617, 92 S. Ct. 1921, 1923 (1972). Although these facts would be insufficient to justify an arrest, they were sufficient to justify Meyer's stop of defendant under *Terry* and section 107—14.

### C. The Pat-Down Search

The State argues the police were justified not only in stopping defendant but also in patting him down for weapons. We agree.

■ Section 108—1.01 of the Code provides, in part, as follows:

"When a peace officer has stopped a person for temporary questioning pursuant to [s]ection 107—14 of this Code and reasonably suspects that he or another is in danger of attack, he may search the person for weapons." 725 ILCS 5/108—1.01 (West 2004).

An officer's right to frisk an individual does not automatically follow the right to stop. *People v. Galvin*, 127 Ill. 2d 153, 165, 535 N.E.2d

837, 842 (1989); see also *People v. Sorenson*, 196 Ill. 2d 425, 433, 752 N.E.2d 1078, 1084 (2001) (a valid investigatory stop "does not automatically justify the further intrusion of a search for weapons"). An officer may frisk a suspect for weapons only if he reasonably believes that person is armed and dangerous. *People v. Moss*, 217 Ill. 2d 511, 529, 842 N.E.2d 699, 711 (2005). The sole justification for the pat-down search under *Terry* "is the protection of the police officer and others in the vicinity, not to gather evidence." *Sorenson*, 196 Ill. 2d at 432, 752 N.E.2d at 1084. "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Sorenson*, 196 Ill. 2d at 433, 752 N.E.2d at 1084, citing *Terry*, 392 U.S. at 27, 20 L. Ed. 2d at 909, 88 S. Ct. at 1883.

In this case, Meyer stopped defendant and Young and asked both of them to put their hands on the bus. Standing behind them, Meyer did not know defendant's identity. During the stop, Meyer could then ask for their identities as he did. See *Hiibel*, 542 U.S. at 186, 159 L. Ed. 2d at 303, 124 S. Ct. at 2458 ("an officer may ask a suspect to identify himself in the course of a *Terry* stop"); see also 725 ILCS 5/107—14 (West 2004). Meyer stated he had not patted down defendant prior to learning his identity.

Based on his training and experience, Meyer testified people working in the narcotics trade often carry concealed weapons. He stated that after defendant identified himself, and knowing defendant's history, Meyer wanted to pat him down for safety reasons. Meyer stated that history included defendant's prior arrests for unlawful discharge of a weapon and unlawful use of a weapon and his involvement in cocaine distribution. Sergeant Davis stated officer safety was an issue considering defendant's weapons violations and his large size. Meyer stated defendant was "a large individual" and outweighed him "by several pounds."

■ Under the totality of the circumstances presented here, we find Detective Meyer was warranted in his belief that a pat-down of defendant was necessary for officer safety. Meyer did not need to be absolutely certain that defendant was armed to conduct a frisk under the *Terry* exception. Instead, Meyer knew Young could be transporting drugs, defendant had engaged in drug dealing, and those involved in the drug trade are known to carry weapons. Although "the mere fact that an officer believes drug dealers carry weapons or narcotic arrests involve weapons is insufficient alone to support reasonable suspicion to justify a *Terry* frisk" (*People v. Rivera*, 272 Ill. App. 3d 502, 509, 650 N.E.2d 1084, 1090 (1995)), Meyer was aware of additional facts

justifying the frisk. When Meyer realized he had stopped defendant, he was aware defendant had prior arrests for weapons offenses and had been involved in distributing cocaine. Considering defendant's size, prior weapons history, and participation in dealing narcotics, a reasonably prudent person under the circumstances would be warranted in the belief that his safety was in danger. See *People v. Freeman*, 219 Ill. App. 3d 240, 245, 579 N.E.2d 576, 579 (1991) (protective frisk was justified, notwithstanding the defendant had not displayed a weapon to complainant and the officer had backup assistance, because the officer knew through official police channels that the defendant had a reputation for carrying weapons). Thus, we find the pat-down search of defendant was proper here.

In granting the motion to suppress on rehearing, the trial court neither disavowed its previous factual findings nor found Wakeford's testimony or that of defendant was more credible than that of the testifying officers. Instead, the court concluded based upon case law that Meyer did not have a reasonable articulable suspicion that defendant was involved in criminal activity or armed. The transcript indicates the court mentioned the *"Ebara* case," and our conclusion does not change when we presume the court was referring to the United States Supreme Court's decision in *Ybarra v. Illinois*, 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338 (1979).

In *Ybarra*, 444 U.S. at 88, 62 L. Ed. 2d at 243, 100 S. Ct. at 340, police officers obtained a search warrant authorizing them to search a tavern and the person of the bartender, who was suspected of selling heroin. While in the tavern, one officer exceeded the scope of the warrant and conducted a pat-down search of all the customers. *Ybarra*, 444 U.S. at 88, 62 L. Ed. 2d at 244, 100 S. Ct. at 341. The officer frisked Ybarra a second time and found packets of heroin in Ybarra's pants pockets. *Ybarra*, 444 U.S. at 89, 62 L. Ed. 2d at 244, 100 S. Ct. at 341.

On appeal, the Supreme Court held that notwithstanding the valid warrant possessed by the police, "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra*, 444 U.S. at 91, 62 L. Ed. 2d at 245, 100 S. Ct. at 342. The Court found the State failed to present specific facts that would justify a police officer in suspecting Ybarra was armed and dangerous. *Ybarra*, 444 U.S. at 93, 62 L. Ed. 2d at 247, 100 S. Ct. at 343. In finding the frisk of Ybarra invalid, the Court stated the " 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics

search is taking place." *Ybarra*, 444 U.S. at 94, 62 L. Ed. 2d at 247, 100 S. Ct. at 343.

We find *Ybarra* distinguishable. Detective Meyer did not pat down defendant for weapons merely because he happened to have exited the bus with or was in the presence of Young, the man suspected of carrying crack cocaine. Meyer's suspicions soon became directed at defendant, however, knowing three individuals were involved in drug dealing, observing defendant's evasive movement, learning defendant's identity, and recalling his criminal history. Meyer was conducting a valid investigative stop and had reasonable suspicion particularized to defendant to pat him down for weapons, unlike the factual scenario found in *Ybarra*. As Meyer was justified in stopping defendant and patting him down for weapons, the trial court erred in granting the motion to suppress.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

Reversed and remanded.

APPLETON and COOK, JJ., concur.