Ernest DAVIS, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 49A04–0601–CR–19.

Court of Appeals of Indiana.

Dec. 11, 2006.

Marshelle Dawkins Broadwell, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Matthew D. Fisher, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

**OPINION**

RILEY, Judge.

### STATEMENT OF THE CASE

Appellant–Defendant, Ernest Davis (Davis), appeals the trial court's denial of his Motion to Suppress.

We reverse and remand.

### ISSUE

Davis raises two issues on appeal, which we consolidate and restate as the following single issue: Whether the trial court properly denied Davis' Motion to Suppress.

### FACTS AND PROCEDURAL HISTORY

On March 25, 2005, Indianapolis Police Officer Khevin Watterson (Officer Watterson) was working undercover surveilling a 24–hour Marathon gas station located at the intersection of 10th Street and Tibbs Avenue in Indianapolis. He was a member of the Neighborhood Resource Officer Unit on the lookout for narcotics, firearms, and prostitution activity in the area. Officer Watterson was sitting in his unmarked police car in a liquor store parking lot across the street from the Marathon station wearing a dark hooded sweatshirt, jeans, and a vest that said "POLICE" in plain white letters. (Transcript pp. 11, 20). He wore his badge on his shoulder. Officer Watterson had made between twenty and fifty arrests at this Marathon station over the past four years, mostly for narcotics, illegal firearms, and prostitution.

Officer Watterson had been surveilling the Marathon station for approximately twenty minutes when a green Ford Taurus failed to use its turn signal as it turned into the gas station. The vehicle circled the gas station and parked. About ten minutes later a second vehicle pulled into the gas station and parked next to the Taurus. The front seat passenger of the Taurus got into the front passenger seat of the second vehicle, which then circled the lot and left the gas station. Officer Watterson radioed to a uniformed officer to follow and investigate the second vehicle and for a uniformed officer to come to the gas station. The Taurus remained parked.

In the meantime, based on these observations, Officer Watterson pulled across the street to a gas pump, watched the Taurus for another ten to fifteen seconds, approached and "stopped" the car. (Tr. p. 13). Officer Watterson knocked on the drivers' side window and the driver, Charles Brennan (Brennan) rolled down

the window. Officer Watterson informed Brennan he was stopping him because he failed to use his turn signal when he pulled into the gas station and for suspected narcotics activity.

Officer Watterson asked Brennan "if he had any weapons in the vehicle." (Tr. p. 14). Brennan replied that he had a gun under his seat. Officer Watterson asked if he had a permit for the gun to which Brennan responded affirmatively. At this point, Officer Watterson was still unaware there was a passenger in the rear of the vehicle because the tint on the windows was so dark. He asked Brennan to exit the vehicle and handcuffed him.

After Officer Watterson had Brennan in handcuffs, Officer Damon King (Officer King) arrived at the scene. Officer King testified that the silhouette of a person could be seen in the back seat of the vehicle and asked Officer Watterson if he wanted the passenger removed from the vehicle. Officer King opened the door and asked the passenger, later identified as Davis, to exit the vehicle. After Davis stepped out of the vehicle, Officer King noticed the barrel of a gun under the passenger's seat and immediately handcuffed Davis. Officer King never asked Davis if he had a permit for the gun. In fact, when Officer King told Davis he was being charged with possession of a firearm, Davis told Officer King, "[n]o, you crazy. I don't have no firearm." (Tr. p. 53).

On March 29, 2005, the State filed an Information charging Davis with Count I, unlawful possession of a firearm by a serious violent felon, a Class B felony, Ind. Code § 35–47–4–5; and Count II, carrying a handgun without a license, a Class A misdemeanor, I.C. § 35–47–2–1. On August 8, 2005, Davis filed a Motion to Suppress. On November 4, 2005, the trial court held a hearing on the Motion. On November 8, 2005, the trial court denied Davis' Motion to Suppress.

Davis now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

Davis argues the trial court improperly denied his Motion to Suppress evidence. Specifically, Davis contends Officer Watterson was not in a distinctive police uniform, nor was there reasonable suspicion of criminal activity. Thus, Officer Watterson had no authority to detain the occupants of the vehicle.

 Our review of the denial of a motion to suppress is similar to other sufficiency matters. *Gonser v. State*, 843 N.E.2d 947, 949 (Ind.Ct.App.2006). The record must disclose substantial evidence of probative value that supports the trial court's decision. *Id.* We do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling. *Id.* On appellate review, we will affirm the trial court's ruling on a motion to suppress if it is sustainable on any legal theory supported by the record, even if the trial court did not use that theory. *Id.*

### I. *Ind.Code § 9–30–2–2*

 First, we will address whether Officer Watterson had authority to stop Brennan's car for failing to use his turn signal. I.C. § 9–30–2–2 provides that in order for an officer to make an arrest or issue a traffic information or summons for a violation of a law regulating operation of a motor vehicle, *the officer must be either wearing a uniform and badge, or driving a clearly marked police vehicle.* In the past, this court has rejected several attempts by the State to seek convictions based upon police officers acting in contravention of this statute. *See Bovie v. State*, 760 N.E.2d 1195 (Ind.Ct.App.2002) (a

badge alone is not enough to controvert the requirement that a police officer must be in uniform or driving a clearly marked police vehicle to effectuate a traffic stop); *Miller v. State*, 641 N.E.2d 64 (Ind.Ct.App. 1994), *trans. denied* (an officer not wearing a uniform or driving a police vehicle did not have the authority to make an arrest for violating Indiana law regarding the use of motor vehicles); *State v. Caplinger*, 616 N.E.2d 793 (Ind.Ct.App.1993) (an officer not wearing a uniform or driving a police vehicle did not have the authority to arrest defendant for violating the use of motor vehicles under State laws).

In this case, Officer Watterson donned a dark hooded sweatshirt, jeans, and a vest that said "POLICE" in plain white letters; wore his badge on his shoulder; and drove a truck. (Tr. pp. 11, 20). The vest did not bear his name, that of the Indianapolis Police Department, or a logo, nor were there any other marks of distinction on the vest. We find that Officer Watterson's attire is not a uniform for the purposes of stopping someone for violating an Indiana law regulating the operation of a motor vehicle.

Furthermore, Davis testified that when Officer Watterson approached the car, he thought Officer Watterson was trying to rob Brennan. Implicit in the language of I.C. § 9–30–2–2 is the purpose behind the statute—to protect drivers from police impersonators and to protect officers from resistance should they not be recognized as officers. *Bovie*, 760 N.E.2d at 1198. The presence of weapons in Brennan's car and the failure of Davis to recognize Officer Watterson as a police officer reinforces the rationale behind I.C. § 9–30–2–2. As such, we find Officer Watterson was precluded from conducing a traffic stop and effectuating either an arrest or simply an investigatory stop based on his lack of uniform and marked police vehicle. *See id.*

## II. *Reasonable Suspicion*

We will now address whether Officer Watterson had reasonable suspicion based on the totality of the circumstances to stop Brennan for a suspected narcotics violation. The Fourth Amendment to the United States Constitution guarantees the right to be secure against unreasonable search and seizure. *State v. Murray*, 837 N.E.2d 223, 225 (Ind.Ct.App. 2005), *trans. denied.* The police may stop an individual for investigatory purposes if, based on specific, articulable facts, the officer has a reasonable suspicion that criminal activity is afoot. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Such reasonable suspicion must be comprised of more than hunches or unparticularized suspicions. *Murray*, 837 N.E.2d at 225–26. That is, a police officer must be able to point to specific facts giving rise to a reasonable suspicion of criminal activity. *Id.* On review, this court considers whether the facts known by the police at the time of the stop were sufficient for a man of reasonable caution to believe that an investigation is appropriate. *Id.* The grounds for such a suspicion must be based on the totality of the circumstances. *Id.*

We also note that a "reasonable suspicion" entails some minimum level of objective evidentiary justification. *Denton v. State*, 805 N.E.2d 852, 855 (Ind.Ct. App.2004), *trans. denied.* A court seeking to determine the existence of reasonable suspicion must require an officer to articulate the factors leading to that conclusion. *Id.* It is the requirement of reasonable suspicion that strikes a balance between the government's legitimate interest in traffic safety and an individual's reasonable expectation of privacy. *Id.* at 855–56.

■ Under Art. 1, § 11 of the Indiana Constitution, the search and seizure analysis is slightly different than under the Fourth Amendment of the United States Constitution. The purpose of Art. 1, § 11 is "to protect from unreasonable police activity those areas of life that Hoosiers regard as private." *Brown v. State*, 653 N.E.2d 77, 79 (Ind.1995). Our supreme court recognized that "Hoosiers regard their automobiles as private and cannot easily abide their uninvited intrusion." *Brown*, 653 N.E.2d at 80. In deciding whether a warrantless search and seizure violates Art. 1, § 11, we must determine whether, under the totality of the circumstances, the investigatory stop was reasonable.

In the case at bar, Officer Watterson observed the following set of circumstances: A vehicle pulled into a gas station and parked. Minutes later a second vehicle pulled into the gas station and parked next to the first vehicle. A passenger from the first vehicle got into the second vehicle, which then left the gas station. Thereafter, Officer Watterson stopped the first vehicle, which had yet to leave the gas station, on suspicion of narcotics activity. We agree with Davis that to label the behavior displayed by the vehicles in this case as *suspicious* would give the police leave to legally stop anyone in a neighborhood known for its unlawful activity, regardless of the seemingly innocent behavior portrayed by citizens. We have held that presence in a high crime area alone is not sufficient to create reasonable suspicion to justify an investigatory stop. *See Green v. State*, 719 N.E.2d 426, 429 (Ind. Ct.App.1999); *Tumblin v. State*, 664 N.E.2d 783, 784 (Ind.Ct.App.1996); *Wilson v. State*, 670 N.E.2d 27, 31 (Ind.Ct.App. 1996); *Williams v. State*, 477 N.E.2d 96, 98 (Ind.1985), *reh'g denied.* The public interest and an individual's right to personal security and privacy tilts in favor of freedom from police interference in this case. *See Tumblin*, 664 N.E.2d at 784. Thus, we find Officer Watterson did not have reasonable suspicion based on the totality of the circumstances to stop Brennan for a suspected narcotics violation.

### CONCLUSION

Based on the foregoing, we conclude the trial court improperly denied Davis' Motion to Suppress.

Reversed.

MAY, J., concurs.

BAILEY, J., dissents with separate opinion.

BAILEY, Judge, dissenting.

I respectfully dissent from the majority's conclusion that Officer Watterson did not have reasonable suspicion to stop Brennan for suspected narcotics activity. The totality of the circumstances was sufficient for a police officer of reasonable caution to believe that an investigation of the Taurus for narcotics activity was appropriate.

The United States Supreme Court announced in *Ornelas v. U.S.* that "the principal components of a determination of reasonable suspicion or probable cause will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to reasonable suspicion or to probable cause." 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). It noted further "a police officer views the facts through the lens of his police experience and expertise." *Id.* at 699, 116 S.Ct. 1657. Therefore, in determining whether the totality of the circumstances supports a finding of reasonable suspicion, we must look at the circum-

stances through the lens of the police officer's experience and expertise leading up to the so-called *Terry* stop.

Officer Watterson is a patrolman on the Indianapolis Police Department's Neighborhood Resource Officer Unit, combating mainly street-level drug dealing, handguns, and prostitution. In the past four years, this particular Marathon gas station on Tibbs Avenue has been the location of twenty to fifty arrests made by Officer Watterson for crimes involving narcotics, handguns, and prostitution. In fact, this location was one that Officer Watterson watched regularly for such criminal activity. From these experiences, it can be reasonably inferred that this street patrol officer had gained an expertise in differentiating between behavior indicating illegal activity and behavior of legitimate customers of the Tibbs Avenue gas station. Based on his testimony, Officer Watterson was not acting on knowledge that the general neighborhood was crime ridden, but that this specific gas station was a hot spot for illegal activities, including narcotics dealing. This officer's specific knowledge about the location provides a much stronger foundation for reasonable suspicion when observing the particular events on March 25, 2005.

First, a Taurus with heavily tinted windows pulled into the gas station, circling the lot before parking at the far west curb of the gas station. For ten minutes, the Taurus sat in the parking lot known for drug activity. None of the passengers exited the vehicle to make business transactions typically associated with a gas station. However, in that same interval, occupants of other vehicles had entered and exited the gas station, making appropriate business transactions.

Second, a white car pulled into the gas station, coming to a stop beside the Taurus. Then, a man exited the front passenger side of the Taurus and entered the passenger side of the white car, after which the white car proceeded to circle the lot slowly and drive off.

In my opinion, these circumstances observed from the perspective of a police officer that has effectuated numerous arrests in recent years for drug related activity at this very gas station rise to the level of reasonable suspicion. The passengers of both vehicles acted contrary to the other patrons of the Marathon in that they did not make any purchases customary for customers of a gas station. Additionally, violence is commonly associated with the drug trade. Here, the Taurus with dark tinted windows sat in a parking lot known for its drug trade for ten minutes. No one was observed exiting the vehicle during this interval; yet, when the passenger leapt from the Taurus and into the white car, the Taurus remained in the parking lot and no further activity was observed. In light of these circumstances, I believe there was a reasonable suspicion to warrant the officer's decision to approach the Taurus to check on the occupants' safety and investigate possible illegal activity.

In so concluding, I am guided by the principle that "[a]n appeals court should give due weight to a trial court's finding that the officer was credible and the inference was reasonable." *Ornelas*, 517 U.S. at 699, 116 S.Ct. 1657. I would give such due weight to this trial court's finding that Officer Watterson was credible and that his inference of drug activity based on his experiences with the specific location and from the unusual actions of the occupants of the Taurus and the white car was reasonable.