Filed 6/13/08 NO. 4-07-0187

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|     Plaintiff-Appellant, | ) | Circuit Court of |
|     v. | ) | Macon County |
| PHILLIP L. LEGGIONS, | ) | No. 06CF1546 |
|     Defendant-Appellee. | ) | |
| | ) | Honorable |
| | ) | James R. Coryell, |
| | ) | Judge Presiding. |

_____

PRESIDING JUSTICE APPLETON delivered the opinion of the court:

In November 2006, the State charged defendant, Phillip L. Leggions, with unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2006)). In December 2006, he filed a motion for suppression of evidence on the grounds that the police lacked probable cause or reasonable, articulable suspicion to seize him. At the conclusion of an evidentiary hearing, the circuit court granted the motion. The court found that the police lacked probable cause to arrest defendant and that two people exiting one vehicle and entering another--even in a high-crime area--did not create a reasonable suspicion of criminal activity so as to justify an investigatory stop.

The State appeals, arguing the police had a reasonable suspicion of criminal activity, for the area was known for narcotics trafficking, and when people got out of their own vehicle and into another vehicle, it often meant they were buying and selling narcotics. We conclude that a finding of reasonable suspicion in these circum-

stances would subject too many innocent travelers to arbitrary detention--and with little more, in the way of justification, than their presence in a high-crime neighborhood. Therefore, we affirm the circuit court's judgment.

## I. BACKGROUND

Michael Gannon was a patrol sergeant with the Decatur police department, and he testified that on October 23, 2006, he organized a surveillance of the 1100 and 1200 blocks of East Leafland Avenue. During the first six months of 2006, there had been 12 shooting incidents in those blocks, where gangs, drugs, and murder were rampant. The house at 1128 East Leafland Avenue was a hangout of the Leafland Street Boys' Gang. Gannon personally had "been involved in four weapons seizures from people either coming to or leaving that residence two months prior to this incident," and he also "personally [had] been involved in numerous [drug] transactions at that location."

Gannon testified that at 2:30 p.m. on October 23, 2006, he took a position two to three blocks away from 1128 East Leafland Avenue. He had an unobstructed view of the house. Within 15 minutes, he saw a green GMC Yukon sport utility vehicle park almost directly in front of the house. Within two minutes, a smaller, dark vehicle pulled up behind the Yukon, and two black men got out of that vehicle and into the Yukon. Gannon believed a drug deal was "going down" because in his "12 years of observing numerous drug transactions," "individuals [met] at a location, exit[ed] their vehicle, g[o]t in another vehicle, complete[d] a transaction[,] and then le[ft]." On this occasion, Gannon did not see any drugs or guns from his vantage point two or three blocks away, nor did he see anything change hands. About five minutes after the two men entered the

Yukon, Gannon radioed the other police officers on the scene to move in and investigate, and a squad car pulled in front of the Yukon. Six to eight officers, pistols drawn, ordered everyone in the Yukon to show their hands.

Because the side windows of the Yukon were tinted, the officers opened its doors to make sure no one was pointing a firearm at them. The passengers raised their hands, but defendant, in the driver's seat, put his hands down toward his feet. A Decatur police officer, Chad Shull, ordered everyone out of the Yukon. He then saw, in plain view, a brown piece of paper in the middle of the driver's-side floorboard, between the driver's seat and the brake pedal, and on top of the brown paper, a white substance that looked like crack cocaine. The substance field-tested positive. The police arrested defendant for unlawful possession of a controlled substance (720 ILCS 570/402(c) (West 2006)).

## II. ANALYSIS

### A. Standard of Review

When reviewing a circuit court's ruling on a motion for suppression of evidence, we uphold the court's factual findings unless they are against the manifest weight of the evidence. People v. Gherna, 203 Ill. 2d 165, 175, 784 N.E.2d 799, 805 (2003). If we accept the court's findings of fact, we decide de novo whether those facts require a suppression of evidence. Gherna, 203 Ill. 2d at 175, 784 N.E.2d at 805. The parties do not dispute the facts in this case; they dispute the legal effect of those facts. Our standard of review is de novo.

### B. Initially, Was the Seizure of Defendant an Investigatory Stop or Was It an Arrest?

The fourth amendment provides that "[t]he right of the people to be secure

in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const., amend. IV.  Likewise, under our state constitution, "[t]he people shall have the right to be secure in their persons, houses, papers[,] and other possessions against unreasonable searches[] [and] seizures."  Ill. Const. 1970, art. I, §6.  We interpret article I, section 6, in "limited lockstep" with the fourth amendment.  People v. Caballes, 221 Ill. 2d 282, 313, 851 N.E.2d 26, 44 (2006) (reaffirming the "limited lockstep" doctrine).  "Under this approach, [Illinois courts] will 'look first to the federal constitution, and only if federal law provides no relief [will they] turn to the state constitution to determine whether a specific criterion--for example, unique state history or state experience--justifies departure from federal precedent.' "  Caballes, 221 Ill. 2d at 309, 851 N.E.2d at 42-43, quoting L. Friedman, The Constitutional Value of Dialogue and the New Judicial Federalism, 28 Hastings Const. L.Q. 93, 104 (2000).  Neither of the parties argues for a departure from federal precedent on the ground that article I, section 6, of the Illinois Constitution requires a different outcome than the fourth amendment.  Therefore, we interpret the quoted provisions from the two constitutions as having the same meaning and effect.

  In his motion for suppression of evidence, defendant claims the "seizure" of his "person" by the police was "unreasonable."  See U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6.  The threshold question is whether a seizure occurred.  People v. Jones, 190 Ill. App. 3d 416, 421, 545 N.E.2d 1332, 1335 (1989).  A seizure occurs when, by physical force or a show of authority, a police officer limits a citizen's liberty.  Jones, 190 Ill. App. 3d at 421, 545 N.E.2d at 1334.  More plainly, a police officer "seizes" a person when he or she accosts that person and denies that person the freedom to walk away.

Terry v. Ohio, 392 U.S. 1, 16, 20 L. Ed. 2d 889, 903, 88 S. Ct. 1868, 1877 (1968). Obviously, by pulling their squad car in front of defendant's vehicle, pointing their pistols at him, commanding him to raise his hands and come out of the vehicle, and when he did come out (or they pulled him out), handcuffing him, the police limited his liberty and, therefore, seized him.

The next question is whether the "seizure" was "unreasonable" (U.S. Const., amend. IV; Ill. Const. 1970, art. I, §6); for "what the [c]onstitution forbids is not all searches and seizures, but unreasonable searches and seizures" (Elkins v. United States, 364 U.S. 206, 222, 4 L. Ed. 2d 1669, 1680, 80 S. Ct. 1437, 1446 (1960)). To answer that question, we must determine what kind of seizure it initially was. Case law recognizes two types of seizures of the person:  an investigatory stop and an arrest. People v. Murray, 137 Ill. 2d 382, 387, 560 N.E.2d 309, 311 (1990). To be reasonable, an arrest requires probable cause, whereas an investigatory stop requires reasonable suspicion. People v. Montgomery, 332 Ill. App. 3d 817, 820-21, 773 N.E.2d 225, 228 (2002). The former standard is more stringent than the latter. People v. Lampitok, 207 Ill. 2d 231, 255, 798 N.E.2d 91, 106 (2003). "Probable cause exists if the facts and circumstances known to the officer warrant a prudent man in believing that the offense has been committed." Henry v. United States, 361 U.S. 98, 102, 4 L. Ed. 2d 134, 138, 80 S. Ct. 168, 171 (1959). "Reasonable suspicion exists when 'articulable facts which, taken together with the rational inferences from those facts, *** warrant a reasonably prudent officer' to investigate further [for criminal activity]." Lampitok, 207 Ill. 2d at 255, 798 N.E.2d at 106, quoting Maryland v. Buie, 494 U.S. 325, 334, 108 L. Ed. 2d 276, 286, 110 S. Ct. 1093, 1098 (1990). Though less than probable cause, reasonable suspicion is more

than a hunch on the officer's part; it is an objective standard:  the officer's subjective belief that he or she has an adequate cause for suspicion will not suffice.  Lampitok, 207 Ill. 2d at 255, 798 N.E.2d at 106-07.

An arrest requires a stronger justification than an investigatory stop because an arrest is a lengthier seizure of the person.  People v. Waddell, 190 Ill. App. 3d 914, 926, 546 N.E.2d 1068, 1075 (1989).  An investigatory stop (often called a "Terry stop" after Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968)) is a short detention of the person--a detention lasting no longer than is necessary to perform a brief investigation.  People v. Hess, 314 Ill. App. 3d 306, 310, 732 N.E.2d 674, 677 (2000); 725 ILCS 5/107-14 (West 2006).  A detention for a period longer than is necessary to perform a brief investigation is considered to be an arrest.  People v. Hardy, 142 Ill. App. 3d 108, 114, 491 N.E.2d 493, 498 (1986); People v. Roberts, 96 Ill. App. 3d 930, 933-34, 422 N.E.2d 154, 156-57 (1981).  "[During] a lawful traffic stop, the police may, as a matter of course, order the driver and the passengers out of the vehicle[,] pending the completion of the stop[,] without violating the protections of the fourth amendment."  People v. Synnott, 349 Ill. App. 3d 223, 228, 811 N.E.2d 236, 241 (2004).  Because it would be illogical to grant police officers the authority to make an investigatory stop while denying them the authority to enforce or effectuate that stop, the status or nature of the investigatory stop does not change merely by virtue of the officer's drawing a gun or using handcuffs.  People v. Moore, 294 Ill. App. 3d 410, 415, 689 N.E.2d 1181, 1185 (1998); Waddell, 190 Ill. App. 3d at 928, 546 N.E.2d at 1076.  "Regardless of the initial restraint of the person's movement, whether a stop becomes an arrest is determined by the length of time the person is detained and the scope of the

- 6 -

investigation that follows the initial stop." People v. Ross, 317 Ill. App. 3d 26, 32, 739 N.E.2d 50, 56 (2000); see also People v. Walters, 256 Ill. App. 3d 231, 237, 627 N.E.2d 1280, 1285 (1994); People v. Smith, 208 Ill. App. 3d 44, 49-50, 566 N.E.2d 939, 943 (1991).

By drawing their pistols and putting defendant in handcuffs, the police did not arrest him. Gannon testified he radioed the other officers to approach the Yukon for the purpose of investigating a possible drug transaction. Soon after the police converged on the Yukon and ordered the occupants out, they saw the cocaine in plain view; at that point, they acquired probable cause to arrest defendant. See People v. Stroud, 189 Ill. App. 3d 1034, 1038, 546 N.E.2d 293, 294 (1989). The issue is whether they had reasonable suspicion to justify an investigatory stop in the first place, for without the stop, they would not have opened the doors of the Yukon and seen the cocaine in plain view. See People v. Reynolds, 101 Ill. App. 3d 576, 580, 428 N.E.2d 694, 697 (1981) (evidence obtained as a result of a violation of the defendant's fourth-amendment rights must be suppressed as "fruit of the poisonous tree").

C. Did the Police Have Cause for Reasonable Suspicion?

In Brown v. Texas, 443 U.S. 47, 52, 61 L. Ed. 2d 357, 362-63, 99 S. Ct. 2637, 2641 (1979), the Supreme Court held that a person's presence in an area of expected criminal activity was not enough, in itself, to support a reasonable, particular-ized suspicion that the person was committing a crime. The standard of reasonable suspicion required something more-- and that "something more" had to be something other than what people commonly did (otherwise, the high-crime area would effectively be the sole basis of reasonable suspicion). In Brown, two police officers were cruising in

their patrol car through an area of El Paso that had a high incidence of drug traffic when "[t]hey observed [the] appellant and another man walking in opposite directions away from one another in an alley. Although the two men were a few feet apart when they first were seen, Officer Venegas later testified that both officers believed the two had been together or were about to meet until the patrol appeared." Brown, 443 U.S. at 48, 61 L. Ed. 2d at 360, 99 S. Ct. at 2639. The Supreme Court explained: "The flaw in the State's case is that none of the circumstances preceding the officers' detention of [the] appellant justified a reasonable suspicion that he was involved in criminal conduct. Officer Venegas testified at [the] appellant's trial that the situation in the alley 'looked suspicious,' but he was unable to point to any facts supporting that conclusion." Brown, 443 U.S. at 51-52, 61 L. Ed. 2d at 362, 99 S. Ct. at 2641. Then, in a footnote, the Supreme Court added: "This situation is to be distinguished from the observations of a trained, experienced police officer who is able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer." Brown, 443 U.S. at 52 n.2, 61 L. Ed. 2d at 362 n.2, 99 S. Ct. at 2641 n.2. The Supreme Court continued: "There is no indication in the record that it was unusual for people to be in the alley. The fact that [the] appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that [the] appellant himself was engaged in criminal conduct. In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood." Brown, 443 U.S. at 52, 61 L. Ed. 2d at 362-63, 99 S. Ct. at 2641.

If Venegas had testified, as a "trained, experienced police officer," that drug dealers often met their clients in alleys, it seems doubtful that such testimony

would have made a difference, for the fact would have remained that pedestrians commonly and in perfect innocence encountered other pedestrians in alleys. Although courts consider the training and experience of the officer as part of the totality of circumstances, they need not implicitly accept all of the officer's suspicions as reasonable, " 'nor does mere experience mean that an [officer's] perceptions are justified by the <u>objective</u> facts. The "basis of the police action must be such that it can be reviewed judicially by an objective standard." ' " (Emphasis in original.) <u>State v. Young</u>, 212 Wis. 2d 417, 429, 569 N.W.2d 84, 90 (Wis. App. 1997), quoting <u>United States v. Buenaventura-Ariza</u>, 615 F.2d 29, 36 (2d Cir. 1980), quoting <u>United States v. Rico</u>, 594 F.2d 320, 324 (2d Cir. 1979).

In <u>Illinois v. Wardlow</u>, 528 U.S. 119, 121-22, 145 L. Ed. 2d 570, 574-75, 120 S. Ct. 673, 674-75 (2000), the objective fact, over and above the heavy narcotics trafficking in the neighborhood, was the defendant's unprovoked flight at the approach of the police car. Running from a police officer is different from casually walking through an alley. Lots of people walk through alleys, but, comparatively speaking, not many people spontaneously run from police officers. "Headlong flight--wherever it occurs--is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." <u>Wardlow</u>, 528 U.S. at 124, 145 L. Ed. 2d at 576, 119 S. Ct. at 676. Running from a police officer in a high-crime neighborhood--or, indeed, anywhere ("wherever it occurs")--was enough to arouse reasonable suspicion. <u>Wardlow</u>, 528 U.S. at 124, 145 L. Ed. 2d at 576, 120 S. Ct. at 676.

In the present case, defendant did not flee, and we have found no Illinois case with facts comparable to this one. Because the determination of reasonable

suspicion is multifaceted and fact-intensive, " 'one determination will seldom be a useful "precedent" for another.' " <u>Ornelas v. United States</u>, 517 U.S. 690, 698, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1662 (1996), quoting <u>Illinois v. Gates</u>, 462 U.S. 213, 238 n.11, 76 L. Ed. 2d 527, 548 n.11, 103 S. Ct. 2317, 2332 n.11 (1983). We have found two cases from other jurisdictions, however, that are analogous in their facts.

In the first case, <u>Riley v. State</u>, 892 A.2d 370, 372 (Del. 2006), some Newark police officers were monitoring the parking lot of a liquor store for sales of liquor to minors. The Supreme Court of Delaware accepted the characterization of this parking lot as a high-crime area: it was "arguably a location known for the crime of 'providing alcohol to minors.' " <u>Riley</u>, 892 A.2d at 376. At 8 p.m., a Ford Escort arrived with two female passengers, both of whom appeared to be underage. <u>Riley</u>, 892 A.2d at 372. Five to ten minutes later, a Ford Taurus parked one or two spaces from the Escort. <u>Riley</u>, 892 A.2d at 372. The defendant, John A. Riley, got out of the Taurus and entered the rear passenger side of the Escort. <u>Riley</u>, 892 A.2d at 372. The two women then turned to face Riley and, while periodically "'looking around,'" had a conversation with him. <u>Riley</u>, 892 A.2d at 372. "Based upon these observations and prior investigations of adults providing alcohol to minors, [the] officers believed they might have been witnessing a request by the underage girls for the man to purchase them alcohol or, perhaps, a drug transaction." <u>Riley</u>, 892 A.2d at 373. The officers pulled their car behind the Escort to prevent it from driving away. <u>Riley</u>, 892 A.2d at 373. Displaying their badges and identifying themselves as police, they approached the Escort, and when Riley failed to show his hands, they opened the door and asked him to step out. <u>Riley</u>, 892 A.2d at 373. They smelled marijuana and saw a bottle of pills on the floor of the Escort (as it

- 10 -

turned out, the bottle contained Xanax not in the original container).  Riley, 892 A.2d at 373.  An officer asked Riley where the drugs were, and Riley showed him the marijuana in his lap.  Riley, 892 A.2d at 373.

The Supreme Court of Delaware stated that although Riley's presence in a high-crime area could have been a factor for the police to consider when evaluating the possibility of a crime in progress, it was not enough, by itself, to create reasonable suspicion.  Riley, 892 A.2d at 376.  The court further held that Riley's getting out of the Taurus, entering the Escort, and speaking to underage girls--in conjunction with the circumstance that they were in a high-crime area--still was insufficient to create reasonable suspicion.  Riley, 892 A.2d at 378.  "The observations of the officers were all consistent with innocent behavior."  Riley, 892 A.2d at 378.

In the second case, Davis v. State, 858 N.E.2d 168, 170 (Ind. App. 2006), a 24-hour Marathon gas station in Indianapolis was the site of 20 to 50 arrests over the past four years, mostly for narcotics, illegal firearms, and prostitution.  A police officer saw a Ford Taurus pull into the gas station and, 10 minutes later, a second vehicle pull into the gas station and park next to the Taurus.  Davis, 858 N.E.2d at 170.  The front-seat passenger of the Taurus got into the front passenger seat of the second vehicle, which then circled the lot and left the gas station.  Davis, 858 N.E.2d at 170.  The officer stopped the Taurus on suspicion of drug activity.  Davis, 858 N.E.2d at 171.  The Court of Appeals of Indiana agreed with the defendant that "to label the behavior displayed by the vehicles in this case as suspicious would give the police leave to legally stop anyone in a neighborhood known for its unlawful activity, regardless of the seemingly innocent behavior portrayed by citizens."  (Emphasis in original.)  Davis, 858 N.E.2d at 173.

- 11 -

Presence in a high-crime area, by itself, was insufficient to justify an investigatory stop. <u>Davis</u>, 858 N.E.2d at 173. The appellate court concluded that when weighed against the public interest, the individual's right to freedom from arbitrary interference by the police should prevail and that the trial court erred in denying the motion for suppression. <u>Davis</u>, 858 N.E.2d at 173.

When assessing the reasonableness of a seizure, we weigh " ' "the public interest" ' " against " ' "the individual's right to personal security free from arbitrary interference by law officers." ' " <u>Brown</u>, 443 U.S. at 50, 61 L. Ed. 2d at 361, 99 S. Ct. at 2640, quoting <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 109, 54 L. Ed. 2d 331, 336, 98 S. Ct. 330, 332 (1977), quoting <u>United States v. Brignoni-Ponce</u>, 422 U.S. 873, 878, 45 L. Ed. 2d 607, 615, 95 S. Ct. 2574, 2579 (1975). When the facts used to justify an investigatory detention " 'describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures' " (<u>People v. Ortiz</u>, 317 Ill. App. 3d 212, 225, 738 N.E.2d 1011, 1021 (2000), quoting <u>Reid v. Georgia</u>, 448 U.S. 438, 441, 65 L. Ed. 2d 890, 894, 100 S. Ct. 2752, 2754 (1980)), the balance "tilts in favor of freedom from police interference" (<u>Brown</u>, 443 U.S. at 52, 61 L. Ed. 2d at 363, 99 S. Ct. at 2641). A very large category of innocent travelers get out of their own cars and into other people's cars. Teenagers do so. Friends do so when they simply want to confer together and make plans for the day. If we deemed such behavior, together with presence in a high-crime neighborhood, to create reasonable suspicion, we would be giving the police absolute discretion to intrude into the lives of this broad category of innocent travelers simply because they had the misfortune to visit or reside in a high-crime neighborhood. "If the facts of this case were sufficient grounds for a temporary detention, every person

who meets a friend \*\*\* to exchange football tickets or engage in a brief conversation would be subject to police investigation."  <u>Green v. State</u>, 744 S.W.2d 313, 314 (Tex. App. 1988).  We would be giving the police "implicit authorization to create and apply an inferior set of rights to individuals in high-crime areas, presumably because those individuals are regarded as being less worthy than other citizens."  J. Herbert, <u>Can't You See What I'm Saying?  Making Expressive Conduct a Crime in High-Crime Areas</u>, 9 Geo. J. on Poverty L. & Pol'y 135, 136 (2002).  "The character of the neighborhood as one prone to crime or narcotics sales can come to dominate the reasonable[-]suspicion inquiry, allowing stops even where the particularized observations of the suspect offered in support of the stop are extremely minimal."  M. Raymond, <u>Down on the Corner, Out in the Street: Considering the Character of the Neighborhood in Evaluating Reasonable Suspicion</u>, 60 Ohio St. L.J. 99, 99 (1999).  We conclude that beyond the character of the neighborhood, the observations in this case are too minimal to support a reasonable suspicion and the balance tilts in favor of the individual's right to personal security and freedom from arbitrary detention.

### III. CONCLUSION

For the foregoing reasons, we affirm the circuit court's judgment.

Affirmed.

KNECHT, J., concurs.

MYERSCOUGH, J., dissents.

JUSTICE MYERSCOUGH, dissenting:

I respectfully dissent. While I recognize the out-of-state precedent cited by the majority, the totality of the circumstances in this case demonstrates the officers had reasonable, articulable suspicion of criminal activity.

Whether a Terry stop was reasonable is determined by looking at the totality of the circumstances. People v. Cordero, 358 Ill. App. 3d 121, 125, 830 N.E.2d 830, 834 (2005) (finding that mere presence of a car in a parking lot after hours was insufficient to justify a Terry stop where the officer did not testify that the area was a high-crime area or that she was aware of recent criminal activity in the area). While being parked in a high-crime area does not alone create reasonable suspicion, it is a factor to consider. See Wardlow, 528 U.S. at 124, 145 L. Ed. 2d at 576, 120 S. Ct. at 676.

In this case, given the totality of the circumstances, the officers had reasonable suspicion of criminal activity to justify the initial seizure of defendant. Gannon testified that defendant had parked in a high-crime area in front of a house known as the hangout for a local gang. Gannon also testified that he had personally been involved in four weapon seizures from people either coming to or leaving 1128 East Leafland in the two months prior to this incident and had been involved in drug transactions "at that location." Evidence of recent crime activity in the area can be a factor supporting reasonable suspicion. See People v. Rivera, 304 Ill. App. 3d 124, 128, 709 N.E.2d 710, 713 (1999) (finding the defendant's presence in an airport parking lot at 8 p.m. when no airport offices were open and where prior burglaries had occurred supported reasonable suspicion justifying the stop). Moreover, Gannon testified he was familiar with drug transactions. Although Gannon did not observe drugs changing

- 14 -

hands, he did testify that the actions of defendant and the other two men--meeting at a location, individuals exiting one vehicle and entering the other vehicle--were consistent with other drug transactions he had observed.

I would also find that the officers' act of drawing their weapons was reasonable. When arrest-like measures are used, such as drawing weapons, the measures must be """reasonable in light of the circumstances that prompted the stop or that developed during its course.""" People v. Nitz, 371 Ill. App. 3d 747, 754, 863 N.E.2d 817, 823-24 (2007) (involving handcuffing), quoting 4 W. LaFave, Search & Seizure §9.2(d), at 304 (4th ed. 2004), quoting United States v. Acosta-Colon, 157 F.3d 9, 15 (1st Cir. 1998).

Individuals involved in the drug trade often carry weapons. People v. Austin, 365 Ill. App. 3d 496, 506, 849 N.E.2d 112, 121 (2006) (involving a pat down for officer safety). Because drug arrests have inherent dangers, it may be entirely reasonable for officers to draw their weapons if confronting a drug suspect. See United States v. Askew, 403 F.3d 496, 508 (7th Cir. 2005) (finding that officers executed a Terry stop, not an arrest, when they surrounded the defendant's car and approached with their guns drawn; such actions were reasonable in light of suspicion that one of the people in the car was about to commit a drug-related crime).

In this case, not only did the officers suspect defendant was engaged in a drug transaction, the officers knew that the area was a high-crime area where a number of weapon seizures had occurred. Moreover, when told to put his hands up, defendant reached down. On these facts, the officer's actions were reasonable. Because the officers had reasonable, articulable suspicion that defendant was committing or about to

- 15 -

commit a crime, and because the officers acted reasonably when drawing their weapons,

I would reverse the trial court's order suppressing the evidence.