STATE of Indiana, Appellant–Plaintiff,

v.

Christopher L. RAGER, Appellee–Defendant.

No. 57A03–0707–CR–344.

Court of Appeals of Indiana.

March 24, 2008.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellant.

Jon C. Owen, Kendallville, IN, Attorney for Appellee.

## OPINION

CRONE, Judge.

### Case Summary

The State of Indiana appeals the granting of a motion to suppress filed by Chris-

topher L. Rager.[1] We affirm.

### Issue

Did police have an objectively justifiable reason to stop Rager's vehicle?

### Facts and Procedural History

The facts most favorable to the trial court's order indicate that at approximately 11:00 p.m. on April 21, 2006, Rome City Deputy Marshal Mark Feller and his partner were conducting a traffic stop on State Road 9. The weather and the pavement were dry, and the two-lane undivided highway had a "straight and level grade." Tr. at 6. Deputy Feller's patrol car was parked facing northbound, with its driver's side protruding approximately three to four feet onto the roadway and its rear red and blue strobe lights flashing. The motorist's vehicle was "pulled off the roadway . . . into the dirt." *Id.* Deputy Feller, his partner, and the motorist were standing on the passenger's side of the motorist's vehicle. Most of the passing northbound vehicles changed lanes and went by "rather slowly." *Id.* at 8. Deputy Feller heard a "whooshing sound" that sounded like a vehicle traveling by "at a higher rate of speed than all the other vehicles on the roadway at the time." *Id.* at 9, 8. Deputy Feller and his partner were "startled and basically jumped back" as Rager's pickup truck traveled northbound and, in Deputy Feller's opinion, "came very close to . . . striking [the] police car." *Id.* at 9.

Deputy Feller radioed a description of Rager's truck to Wolcottville Marshal Ronald Fennell, Jr., who was a quarter mile up the road, and asked him to stop the truck. Deputy Feller believed that Rager had violated Indiana Code Section 9–21–8–35— a traffic regulation statute that we will examine later in this opinion—by failing to "slow and change lanes if possible when there is a police vehicle stopped in the roadway." *Id.* at 10. Marshal Fennell stopped and approached the truck, which was occupied by Rager and his wife. Marshal Fennell noticed "a strong odor of intoxicating beverage coming from inside of the vehicle." *Id.* at 24.

On April 24, 2006, the State charged Rager with class D felony operating a vehicle while intoxicated ("OWI").[2] On December 14, 2006, Rager filed a motion to suppress on the basis that when Marshal Fennell stopped Rager's truck, he "lacked reasonable suspicion that [Rager] was committing a crime and [Rager] was not committing a traffic violation." Appellant's App. at 10. At the suppression hearing on February 8, 2007, Rager's wife indicated that when Rager saw Deputy Feller's flashing lights up ahead, he slowed down and changed lanes, but he "started to pull back into his lane of traffic before he got to the police car[.]" *Id.* at 30. Rager testified that he "pulled back" into the northbound lane before he reached Deputy Feller's car because he "had seen absolutely no visible persons whatsoever." *Id.* at 33. Deputy Feller could not estimate Rager's speed and acknowledged that he did not know whether Rager reduced his speed before he reached the site of the traffic stop. *Id.* at 16. Deputy Feller could not say how close Rager's truck got to his police car, "but it definitely attracted [his] attention." *Id.* at 9.

On March 1, 2007, the trial court granted Rager's motion to suppress. The State filed a motion to reconsider, which the trial court denied. This appeal ensued.

---

1. The State may appeal "[f]rom an order granting a motion to suppress evidence, if the ultimate effect of the order is to preclude further prosecution." Ind.Code § 35–38–4–2(5).

2. *See* Ind.Code § 9–30–5–3 (OWI with previous OWI conviction within past five years).

### Discussion and Decision

We employ the following standard of review:

When the State appeals the trial court's grant of the defendant's motion to suppress evidence, the State is appealing from a negative judgment. Consequently, the State has the burden of demonstrating to us that the evidence is without conflict and that the evidence and all reasonable inferences therefrom lead to the conclusion opposite that reached by the trial court. During our review, we consider only the evidence most favorable to the judgment, and we neither reweigh the evidence nor judge the credibility of the witnesses.

*State v. Davis*, 770 N.E.2d 338, 340 (Ind. Ct.App.2002) (citations omitted). "[W]e may affirm a trial court's ruling on admissibility on any theory supported by the record[.]" *Leitch v. State*, 736 N.E.2d 1284, 1286 (Ind.Ct.App.2000), *trans. denied* (2001).

▇▇▇ "The Fourth Amendment to the United States Constitution and Article I, Section 11 of the Indiana Constitution protect an individual's privacy and possessory interests by prohibiting unreasonable searches and seizures." *Howard v. State*, 862 N.E.2d 1208, 1210 (Ind.Ct.App.2007). These "safeguards extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *Moultry v. State*, 808 N.E.2d 168, 170 (Ind.Ct.App. 2004) (referring to Fourth Amendment).[3] The State has the burden of demonstrating that the measures it used to seize evidence were constitutional. *Davis*, 770 N.E.2d at 340.

▇▇▇ "A police officer may stop a vehicle when he observes a minor traffic violation. A stop is lawful if there is an objectively justifiable reason for it, and the stop may be justified on less than probable cause." *Ransom v. State*, 741 N.E.2d 419, 421 (Ind.Ct.App.2000) (citation omitted), *trans. denied* (2001).

It is the requirement of reasonable suspicion which strikes the balance between the government's legitimate interest in traffic safety and an individual's reasonable expectation of privacy. Reasonable suspicion entails some minimum level of objective evidentiary justification. Due weight must be given, not to the officer's inchoate and unparticularized suspicion or "hunch" but to the specific reasonable inferences which the officer is entitled to draw from the facts in light of his experience. A court sitting to determine the existence of reasonable suspicion must require the agent to articulate the factors leading to that conclusion.

*Cash v. State*, 593 N.E.2d 1267, 1268–69 (Ind.Ct.App.1992) (citations omitted).

▇▇▇ "On review, this court considers whether the facts known by the police at the time of the stop were sufficient for a man of reasonable caution to believe that an investigation is appropriate. The grounds for such a suspicion must be based on the totality of the circumstances." *Davis v. State*, 858 N.E.2d 168, 172 (Ind. Ct.App.2006) (citation omitted). "Although a law enforcement officer's good

---

**3.** "Under Article One, section eleven of the Indiana Constitution, the search and seizure analysis is slightly different than under the Fourth Amendment." *Scott v. State*, 775 N.E.2d 1207, 1211 (Ind.Ct.App.2002). Both provisions, however, require an objectively justifiable reason for stopping a person's vehi- cle. Because we conclude that Deputy Feller mistakenly believed that Rager violated Indiana Code Section 9–21–8–35 and therefore did not have an objectively justifiable reason for stopping Rager's vehicle, we need not undertake separate constitutional analyses here.

faith belief that a person has committed a violation will justify a traffic stop, Ind. Code § 34–28–5–3, an officer's mistaken belief about what constitutes a violation does not amount to good faith. Such discretion is not constitutionally permissible." *Ransom,* 741 N.E.2d at 422 (citing *Cash,* 593 N.E.2d at 1269).

 In this case, Deputy Feller believed that Rager had violated Indiana Code Section 9–21–8–35, which reads in pertinent part as follows:

(b) Upon approaching a stationary authorized emergency vehicle, when the authorized emergency vehicle is giving a signal by displaying alternately flashing red, red and white, or red and blue lights, a person who drives an approaching vehicle shall:

(1) proceeding with due caution, yield the right-of-way by making a lane change into a lane not adjacent to that of the authorized emergency vehicle, if possible with due regard to safety and traffic conditions, if on a highway having at least four (4) lanes with not less than two (2) lanes proceeding in the same direction as the approaching vehicle; or

(2) proceeding with due caution, reduce the speed of the vehicle, maintaining a safe speed for road conditions, if changing lanes would be impossible or unsafe.

We conclude that Deputy Feller mistakenly believed that Rager violated the statute. State Road 9 was not a four-lane highway at the site of Deputy Feller's traffic stop, and therefore Rager was not required by statute to change lanes as he approached Deputy Feller's vehicle.[4] Moreover, Deputy Feller had no idea whether Rager reduced the speed of his vehicle as he approached the site of the traffic stop, and there is no indication that Rager was maintaining an unsafe speed for the existing road conditions. After viewing the videotape of the traffic stop recorded from Deputy Feller's vehicle, the trial court remarked that it did not "see much difference" in the speed of Rager's truck compared with the speed of the other passing vehicles. Tr. at 17. Under these circumstances, we conclude that Deputy Feller, and by extension Marshal Fennell, did not have an objectively justifiable reason to stop Rager's vehicle. Therefore, we affirm the trial court's granting of Rager's motion to suppress.

Affirmed.

BAILEY, J., and NAJAM, J., concur.

---

**4.** At the suppression hearing, Deputy Feller testified that the traffic stop site was located in a passing zone. Tr. at 16. The videotape of the traffic stop recorded from Deputy Feller's vehicle demonstrates that although southbound traffic was permitted to change lanes, as indicated by the adjacent dotted yellow centerline, northbound traffic was prohibited from changing lanes, as indicated by the adjacent solid yellow centerline. *See* IND. MANUAL ON UNIFORM TRAFFIC CONTROL DEVICES FOR STREETS & HIGHWAYS, § 3B.01 (describing centerline markings for "two-lane, two-way roadways[,]" including "[o]ne-direction no-passing zone markings consisting of a normal broken yellow line and a normal solid yellow line where crossing the centerline markings for passing with care is permitted for the traffic traveling adjacent to the broken line, but is prohibited for traffic traveling adjacent to the solid line").