FILED

Dec 22 2017, 5:57 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

R. Patrick Magrath
Alcorn Sage Schwartz & Magrath, LLP
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine M. Cooper
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Doran J. Curry, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | December 22, 2017 <br><br> Court of Appeals Case No. <br> 36A04-1702-CR-373 <br><br> Appeal from the Jackson Circuit Court <br><br> The Honorable Richard W. Poynter, Judge <br><br> Trial Court Cause No. <br> 36C01-1501-F2-1 |

**Bailey, Judge.**

## Case Summary

[1] A traffic stop on Indiana Interstate 65 was initiated to warn a driver of the hazards of traveling too slowly in the fast lane. The stop culminated with the discovery of 100 grams of heroin secreted in the clothing of the passenger,

Doran J. Curry ("Curry"). Curry now appeals his convictions and aggregate sentence for Dealing in Cocaine or a Narcotic Drug, as a Level 2 felony,[1] and Resisting Law Enforcement, as a Class A misdemeanor.[2] We affirm.[3]

# Issues

Curry presents three issues for review:

    I.      Whether the trial court abused its discretion by admitting evidence obtained during a pat-down search conducted during a traffic stop;

    II.     Whether the trial court abused its discretion by admitting evidence in violation of Indiana Evidence Rule 404(b); and

    III.    Whether Curry's sentence is inappropriate.

# Facts and Procedural History

On January 14, 2015, at around 1:47 p.m., Indiana State Police Trooper James Wells ("Trooper Wells") approached a vehicle in the left lane of southbound Interstate 65 that was traveling below the posted speed limit of 70 miles per hour. Before the vehicle yielded the lane, Trooper Wells clocked its speed and

---

[1] Ind. Code § 35-48-4-1. Curry does not challenge the evidence supporting his Resisting Law Enforcement conviction; nor does he challenge the evidence supporting his adjudication as a habitual offender.

[2] I.C. § 35-44.1-3-1.

[3] We heard oral argument on December 1, 2017. We thank counsel for their presentations.

determined that it was traveling at approximately 63 miles per hour. Trooper Wells turned on his lights and initiated a traffic stop based upon his belief that slower-moving vehicles were required to remain in the right-hand lane of the roadway.[4]

[4] The driver, Chastity Westmoreland ("Westmoreland"), pulled the vehicle onto the berm of the roadway yet close to the white line. To avoid standing in the roadway, Trooper Wells approached the passenger side. He requested Westmoreland's driver's license and addressed Curry, who had his eyes closed: "is it bright? Did you just wake up?" (Ex. 2, pg. 11.) Curry responded, "Yeah." (Ex. 2, pg. 11.) He handed Trooper Wells a rental agreement for the vehicle in lieu of its registration.

[5] Trooper Wells verbally warned Westmoreland that she could drive slowly, so long as she stayed in the right lane, and he expressed his fear that "she's gonna get run over." (Ex. 2, pg. 11.) Concluding that he could not safely stand next to the driver's door to complete his duties, Trooper Wells asked Westmoreland to "come on back" to his vehicle for the check of her license. (Ex. 2, pg. 11.) Westmoreland acknowledged that she had been traveling too slowly, but assured the officer that she had a valid driver's license and no legal problems. In response to Trooper Wells' inquiries, Westmoreland advised that she and Curry had been to Indianapolis to visit their grandmother, they left the day

---

[4] *See* I.C. § 9-21-5-9, which then provided: "A vehicle that travels at a speed less than the established maximum shall travel in the right lanes to provide for better flow of traffic on the interstate highways."

before, Curry had assisted with the driving, and he was the person who had rented the vehicle. She volunteered the information that she had to get back to work, necessitating a short trip. Trooper Wells advised Westmoreland that her license "looked good" and inquired about Curry's employment. (Ex. 2, pg. 14.) After learning that Curry was Westmoreland's unemployed cousin, Trooper Wells exited his vehicle and re-approached the rental vehicle.

[6] Trooper Wells confirmed with Curry that he had rented the vehicle. He asked for identification, which Curry produced. Trooper Wells asked Curry about the purpose and timing of his travel. Curry responded that he and Westmoreland, his cousin, had been visiting their grandmother. However, when Curry was asked when he saw his grandmother, he "froze," broke eye contact, and began to breathe heavily. (Tr. Vol. III, pg. 117.) After five inquiries, Curry responded "what did she say." (Tr. Vol. III, pg. 117.) Due to Curry's nervousness and evasiveness, Trooper Wells decided to call for backup.[5]

[7] Trooper Wells returned to his police vehicle and reached for his microphone just as Trooper Randall Miller ("Trooper Miller"), who had been patrolling nearby in his canine unit, happened upon the stopped vehicle. Trooper Wells signaled that Trooper Miller should "run the dog" and then contacted the State Police post to obtain criminal record checks on Westmoreland and Curry. (Tr.

---

[5] Trooper Wells also suspected that Curry had been feigning sleep, because Trooper Wells had observed Westmoreland and Curry in conversation, but Curry had his eyes closed when Trooper Wells approached the vehicle.

Vol. III, pg. 119.) Trooper Miller conducted a canine sniff and the dog, certified for detection of certain drugs, alerted at the rear wheel well on the driver's side. Trooper Miller reported the alert to Trooper Wells and they agreed that Trooper Miller should "get [Curry] out" while Trooper Wells was waiting for criminal history and warrant information. (Tr. Vol. III, pg. 121.)

[8] Trooper Miller approached Curry and advised that the police canine had alerted. Curry repeated "the canine alerted" and began shaking. (Tr. Vol. III, pg. 77.) Trooper Miller assessed Curry's demeanor as consistent with "fight or flight" and he assisted Curry out of the vehicle. (Tr. Vol. III, pg. 78.) Trooper Miller commanded Curry to turn around and advised Curry that he would be subjected to a "check for weapons" because the "dog alerted on your car." (Tr. Vol. III, pg. 79, Vol. II, pg. 99.) The trooper detected a large hard object that he initially "thought [to be] a hand gun" and tried to handcuff Curry. (Tr. Vol. III, pg. 80.) However, Curry spun around and Trooper Miller fell to the ground. Curry began to run.

[9] Trooper Wells ran to assist Trooper Miller, commanding Curry to stop. After Curry continued to run, Trooper Wells deployed his taser. When Curry was subdued and on the ground, Trooper Miller advised Westmoreland that Curry "had a bag of dope in his crotch." (Tr. Vol. III, pg. 86.) Ultimately, Curry was found to be in possession of 100 grams of heroin. Westmoreland was released without being given a traffic citation or written warning. Curry was arrested. The entire incident took about ten minutes.

[10] On January 26, 2015, the State charged Curry with Dealing in Cocaine or a Narcotic Drug and Resisting Law Enforcement. The State subsequently alleged Curry to be a habitual offender. Curry filed a series of motions seeking to suppress evidence obtained during the traffic stop. On December 13, 2016, the trial court denied the motions. Curry also filed motions in limine, seeking to exclude references to his past incarceration and to exclude his statements related to drug-dealing activities. The trial court preliminarily ruled that references to incarceration would be inadmissible but Curry's statements explaining his dealing activities would not be excluded.

[11] Curry was tried in a jury trial conducted on December 20 and December 21, 2016. At trial, he objected – without success – to the admission of evidence from the traffic stop and to the admission of his incriminating statements. A jury convicted Curry as charged and he admitted his status as a habitual offender. Curry was sentenced to twenty-five years imprisonment, enhanced by ten years, for his Dealing in Cocaine conviction. He was sentenced to ten days imprisonment for his Resisting Law Enforcement conviction. This appeal ensued.

# Discussion and Decision

## Admission of Evidence

[12] Curry has not, on appeal, specifically challenged the legality of the initial traffic stop. Rather, he focuses upon subsequent police conduct and contends that the

State garnered the evidence against him in violation of his constitutional rights[6] by dual means:  the traffic stop was unreasonably prolonged to facilitate the canine unit arrival and the pat-down was conducted without reasonable suspicion that he was armed and dangerous.  Curry argues that the trial court abused its discretion in admitting the challenged evidence at trial.

[13] The trial court has broad discretion to rule on the admissibility of evidence. *Thomas v. State*, 81 N.E.3d 621, 624 (Ind. 2017).  Generally, evidentiary rulings are reviewed for an abuse of discretion and reversed when admission is clearly against the logic and effect of the facts and circumstances.  *Id.*  However, when a challenge to an evidentiary ruling is predicated on the constitutionality of a search or seizure of evidence, it raises a question of law that is reviewed de novo.  *Id.*  The State has the burden to demonstrate that the measures it used to seize information or evidence were constitutional.  *State v. Rager*, 883 N.E.2d 136, 139 (Ind. Ct. App. 2008).

[14] The Fourth Amendment "regulates all nonconsensual encounters between citizens and law enforcement officials." *Thomas*, 81 N.E.3d at 625.  The Fourth Amendment guarantees that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and

---

[6] Curry alleges that his rights under the Fourth Amendment to the United States Constitution were violated; he does not develop a separate argument with respect to the Indiana Constitution.

particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

## Dog Sniff

[15] "It is unequivocal under our jurisprudence that even a minor traffic violation is sufficient to give an officer probable cause to stop the driver of a vehicle." *Austin v. State*, 997 N.E.2d 1027, 1034 (Ind. 2013). Moreover, a dog sniff is not a search protected by the Fourth Amendment. *State v. Hobbs*, 933 N.E.2d 1281, 1286 (Ind. 2010) (citing *Illinois v. Caballes*, 543 U.S. 405, 490 (2005)). Therefore, "no degree of suspicion is required to summon the canine unit to the scene to conduct an exterior sniff of the car or to conduct the sniff itself." *Id.* A narcotics dog sweep "is an unreasonable investigatory detention if the motorist is held for longer than necessary to complete the officer's work related to the traffic violation and the officer lacks reasonable suspicion that the motorist is engaged in criminal activity." *Austin*, 997 N.E.2d at 1034.

[16] The record does not suggest that Trooper Wells intended to give Westmoreland a traffic ticket for a fine or sanction. The evidence reflects Trooper Wells' intention to warn Westmoreland of the safety hazards of driving too slowly in the fast lane and to verify that the rental car was in lawful possession and its occupants had no outstanding warrants. "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."

*Caballes*, 543 U.S. at 407. Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop. *Rodriquez v. United States*, ___ U.S. ____, 135 S. Ct. 1609, 1615 (2015). These typically include checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance. *Id.* The critical question is not whether the sniff occurs before or after the officer issues a ticket, but whether conducting the sniff prolongs or adds time to the stop. *Id.* at 1616. The burden is on the State to show the time for the traffic stop was not increased due to a canine sniff. *Wells v. State*, 922 N.E.2d 697, 700 (Ind. Ct. App. 2010), *trans. denied*.

[17] Here, the State points out that only a few minutes elapsed before the canine unit arrived and that Trooper Wells was still waiting for a response to his criminal history and warrant request when the dog alerted. Curry does not dispute the brevity of the stop, which was audio and video recorded. Rather, he claims that Trooper Wells unreasonably extended the traffic stop by asking extraneous questions, thereby expanding the window of time for the canine to arrive. Curry asserts that the purposes of the stop were complete when Trooper Wells learned that Westmoreland had a valid driver's license, approximately three minutes into the traffic stop.

[18] In *Bush v. State*, 925 N.E.2d 787 (Ind. Ct. App. 2010), the appellant likewise contended that a valid traffic stop had been unreasonably extended to permit a canine sniff. We acknowledged that the Fourth Amendment can be implicated in the face of undue delay. "The [*Caballes*] Court indicated the Fourth

Amendment would be violated if a traffic stop were unreasonably prolonged in order for a canine sniff to be carried out, because absent reasonable suspicion of criminal activity in addition to the traffic violation, the driver would be unlawfully detained at that point." *Id.* at 790 (citing *Caballes*, 543 U.S. at 407-08). The *Bush* Court observed that cases applying *Caballes* fall within two groups: (1) the canine sniff was a proper incident to a valid traffic stop, having taken place before the purpose of the traffic stop was complete or (2) the purpose of the traffic stop was complete or officers significantly prolonged the stop for the canine unit to arrive. 925 N.E.2d at 790.

[19] Examples of the first category, where a canine sniff was a proper incident to a valid traffic stop, included: *State v. Gibson*, 886 N.E.2d 639, 642 n.4 (Ind. Ct. App. 2008) (there was an unchallenged finding that the canine unit arrived while the officer was writing a traffic ticket); *Myers v. State*, 839 N.E.2d 1146, 1150 (Ind. 2005) (the canine sniff occurred while the traffic ticket was being explained to the defendant, thirteen minutes into the stop); and *United States v. Carpenter*, 406 F.3d 915, 916 (7th Cir. 2005) (canine unit arrived in five minutes or less and while the officer was issuing a ticket for evasion of a red light).

[20] Examples of the second category, involving an improper post-traffic stop dog sniff or significant prolonging of the stop, included: *Wells v. State*, 922 N.E.2d at 700 (canine unit summoned only after the officer obtained all information needed to write a traffic ticket and the canine unit arrived almost forty minutes into a traffic stop that could have been completed in twenty minutes); and *Wilson v. State*, 847 N.E.2d 1064, 1066 (Ind. Ct. App. 2006) (the warning tickets

were written at 2:06 a.m. and the canine unit was summoned at 2:15 a.m., after the defendant declined consent to search the car).

[21] The circumstances surrounding the canine sniff in *Bush* were within the latter category. "Because the State failed to show that either the canine sniff was conducted while the purpose of the traffic stop was ongoing or the canine sniff did not materially increase the duration of the stop, we conclude the canine sniff was not justified as an incident of the stop." *Bush*, 925 N.E.2d at 791. Therefore, we were required to determine whether the officers had reasonable suspicion of criminal activity on the part of Bush or his passenger to justify prolonging the detention. *Id.* Finding that the officers lacked the requisite reasonable suspicion, we found the canine sniff to be an unreasonable expansion of the traffic stop. *Id.* at 792.

[22] More recently, in *Hansbrough v. State*, 49 N.E.3d 1112, 1115 (Ind. Ct. App. 2016), we concluded that a dog sniff of Hansbrough's vehicle did not prolong the duration of a valid traffic stop, where the sniff occurred sixteen minutes into an ongoing traffic stop while the officer was on the phone checking for outstanding warrants. *See also Washington v. State*, 42 N.E.3d 521 (Ind. Ct. App. 2015) (a dog sniff conducted less than eleven minutes after the vehicle was stopped and before the officer completed an electronic ticket did not prolong the stop beyond the time reasonably required to complete the mission of issuing a ticket). On the other hand, a canine sniff was not conducted incidental to a traffic stop where the detaining officer did not run the standard license/warrant check but suspended the stop to conduct a two-to-six-minute "free air sniff" and

it was "apparent" that he could have completed the traffic stop sooner. *State v. Gray*, 997 N.E.2d 1147, 1152 (Ind. Ct. App. 2013).

[23] Here, Trooper Wells initially asked the driver her reason for travel, and she promptly responded. An officer is not prohibited from making such inquiries. *See Thomas*, 81 N.E.3d at 623 (after receiving a tip from a credible confidential informant and initiating a traffic stop, officers "tried to verify each man's identity and their reason for travelling through Marion, Indiana.") Trooper Wells similarly asked Curry about the reason for and timing of his travel. Curry was considerably more reluctant to respond.[7] Some brief delay ensued when Trooper Wells repeatedly asked Curry when the visit to his grandmother took place. Some brief delay was also premised upon Westmoreland's voluntary reference to work and Trooper Wells' follow-up questions. However, we are not persuaded that it is necessary to parse every citizen-officer interaction for indications of efficiency of purpose. "An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

[24] No additional time was expended to summon the canine unit to the scene. Although Trooper Wells had decided to summon the unit, Trooper Miller

---

[7] We do not suggest that Curry was required to answer questions unrelated to the purposes of the traffic stop.

fortuitously arrived before Trooper Wells had to ask. The dog alerted while Trooper Wells awaited requested information on criminal background and warrants. The entirety of the traffic stop was approximately ten minutes. In these circumstances, the State showed that the canine sniff did not materially increase the duration of the stop. Accordingly, as there was no undue delay, the Fourth Amendment was not implicated.

## Pat-down Search

At trial, Curry argued that the heroin retrieved from his person was inadmissible because its discovery had stemmed from an unconstitutional pat-down search conducted without reasonable suspicion of Curry's dangerousness. The State argued that the canine alert had provided officers with probable cause to arrest Curry and conduct a search incident to his arrest; thus, the lesser-intrusive pat-down was necessarily justified. The trial court found the State's position to be persuasive and admitted the challenged evidence. On appeal, we find, for purposes of our analysis, that Curry was in custody. We further find that the intrusion was justified as a custodial search.

The record reveals the following circumstances surrounding the search. Trooper Miller testified that he approached Curry after the canine alert and advised Curry that the dog had alerted. Curry then repeated "the canine alerted" and began visibly shaking. (Tr. Vol. III, pg. 77.) When directed to get out of the vehicle, Curry repeated the simple direction and stared straight ahead. It appeared to Trooper Miller that Curry was stalling. Trooper Miller decided to pat-down Curry for weapons, in part because of the apparent signs of

extreme nervousness, which Trooper Miller characterized as consistent with "fight or flight" signs. (Tr. Vol. III, pg. 78.) Trooper Miller assisted Curry out of the vehicle and conducted a pat-down search which indicated the presence of a hard object in Curry's clothing. Trooper Miller retrieved the item from inside Curry's clothing.

[27] Curry acknowledges that the dog alerted before he was subjected to a pat-down search, but he argues that the general presence or possible presence of drugs is insufficient to justify a pat-down. He relies upon *Rybolt v. State*, 770 N.E.2d 935 (Ind. Ct. App. 2002), *trans. denied*. In *Rybolt*, a panel of this Court found a pat-down search unreasonable when the articulated justifications were (1) the officer was the sole officer present and (2) the officer believed that individuals who use narcotics also carry weapons. *Id.* at 941. There, the officer admittedly had routinely patted-down individuals suspected of committing a drug offense. *Id.*

[28] An officer may perform a pat-down of a driver or passenger when the officer has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether there is probable cause to arrest the individual for a crime. *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Where probable cause for an arrest exists, the suspect may be searched incident to the lawful arrest. *Edwards v. State*, 759 N.E.2d 626, 629 (Ind. 2001). An arrest is the taking or seizure of a person in a way that deprives, interrupts, or restricts the person of his liberty or freedom of movement. *Thomas*, 81 N.E.3d at 625. "Determining whether a person was in custody or deprived of her freedom requires an inquiry into

whether there was a formal arrest or restraint on freedom of movement to a degree associated with a formal arrest." *Id.*

[29] The inquiry uses an objective test that asks whether a reasonable person under the same or similar circumstances would believe that he was not free to resist the entreaties of the police. *Id.* Here, Curry had been informed of the dog alert. Trooper Miller advised Curry that he was displaying such nervousness that he was making the officer nervous. Curry was asked to step out of the vehicle and be subjected to a pat-down search. Given all these circumstances, a reasonable person would not have reasonably believed that he was simply free to walk away. As such, we find that Curry was in custody when he was removed from the vehicle and searched. The next question is whether the search was supported by probable cause.

[30] The question of whether a dog alert gives probable cause to search vehicle occupants has not been squarely addressed by our Indiana Supreme Court. In *Thomas*, the appellant argued that, although a positive canine alert undoubtedly gives officers probable cause to search a vehicle, it does not create probable cause to search any of the vehicle's occupants or to detain them. 81 N.E.3d at 624. The Court responded to the argument:

> As an initial matter, we note that Thomas's argument is partly misplaced. Whether probable cause to *search the vehicle* gave officers probable cause to *search the occupants* is irrelevant. . . . Thomas was not searched.

*Id.* The Court also acknowledged the State's position; that is, the State urged our Indiana Supreme Court to adopt the reasoning of *Richard v. State*, 7 N.E.3d 347 (Ind. Ct. App. 2014).

[31] In *Richard*, officers conducted a traffic stop when they observed a vehicle in front of them repeatedly cross the center line. *Id.* at 348. Two occupants were seated in the front of the vehicle – Christopher Fields in the driver's seat and Charla Richard in the passenger seat. *Id.* Officers recognized both occupants and arrested Fields on an outstanding warrant. *Id.* Then, with Richard still seated inside, a narcotics detection canine was passed around the vehicle and it alerted officers to the presence of narcotics near the driver's door. *Id.* Officers asked Richard to exit the vehicle and they conducted a search. *Id.* As they searched, officers noticed Richard favored one side. *Id.* When Richard raised her right arm upon request, a small tin containing methamphetamine fell out of her shirt and onto the ground. *Id.* Richard was arrested and she subsequently attempted to have the evidence against her suppressed. *Id.* The trial court denied the suppression motion, Richard was convicted, and the Court of Appeals affirmed her conviction, finding, in part, that the canine's alert provided probable cause to believe there were drugs in the vehicle.[8] *Id.* at 349-50.

---

[8] *Richard* relied upon *Maryland v. Pringle*, 540 U.S. 366 (2003), where three men were stopped for speeding and a consent search of the vehicle had yielded cocaine. The Supreme Court addressed the question of whether there was probable cause to believe that Pringle had committed a crime. The unanimous Court concluded: "We think it an entirely reasonable inference from these facts that any or all three of the

[32]     After summarizing the facts and procedural history in *Richard*, the *Thomas* Court addressed the State's contention as follows:

> The State contends that we should heed the reasoning of our Court of Appeals in *Richard* and adopt a rule that allows for the arrest of a vehicle's occupants where there is probable cause to believe that the occupants possess drugs. To the extent that this is the rule in *Richard*, we are inclined to agree with the State, but we depart from the *Richard* panel on the amount of evidence needed to establish probable cause. We rely on numerous facts to make a probable cause determination, not just the canine's alert. In fact, we believe it is unlikely that any of the facts presented here would have, on their own, armed officers with the probable cause necessary to conduct a lawful arrest. The case we are presented with, however, offers much more than a single canine alert to support a probable cause finding.

81 N.E.3d at 627. The *Thomas* Court reiterated: "the canine alert, by itself, may not have been enough to give officers probable cause to arrest Thomas." *Id.* at 628. Accordingly, as *Richard* was not specifically adopted, we will assume at this juncture that something more than a canine sniff is needed to establish probable cause for an arrest and a search incident to that arrest. And, consistent with the reasoning of *Rybolt*, a canine sniff is directed to drug detection and is not necessarily indicative of an individual's dangerousness, such as to independently support a pat-down search.

---

occupants had knowledge of, and exercised dominion and control over, the cocaine. Thus, a reasonable officer could conclude that there was probable cause to believe Pringle committed the crime of possession of cocaine, either solely or jointly." *Id.* at 372.

[33]     Here, officers "had knowledge of facts and circumstances which would warrant a person of reasonable caution to believe that [Curry] was in possession of narcotics." *Id.* at 627. Jinx, a certified drug-detection canine, positively alerted on the vehicle, Curry was the individual who had rented the vehicle, and Curry was the sole person in the vehicle at the time of the alert.[9] Aside from the canine alert, Curry's behavior was suspicious. He repeated the officer's words and directions, sat shaking and staring ahead, did not exit the vehicle promptly upon request, and appeared to Trooper Miller to enter a "fight or flight" mode. (Tr. Vol. III, pg. 78.) Westmoreland had advised that she and Curry were traveling without luggage, which officers knew to sometimes be consistent with dealers transporting drugs. We are mindful that "conduct which would be wholly innocent to the untrained observer might acquire significance when viewed by an officer who is familiar with the practices of drug smugglers and methods used to avoid detection." *State v. Quirk*, 842 N.E.2d 334, 343 (Ind. 2006).

---

[9] We acknowledge that the alert took place at the driver's side rear wheel well, as opposed to where Curry was seated. The lack of close proximity was addressed on direct and cross-examination at the motion to suppress hearing and at trial. Trooper Miller explained that the vehicle ventilation likely allowed air to escape the wheel well, where Jinx could detect it. This was neither supported nor challenged by expert testimony; none is required. "[E]vidence of a dog's satisfactory performance in a certification or training program can itself provide sufficient reason to trust his alert." *Florida v. Harris*, 568 U.S. 237, 246 (2013). That said, Trooper Miller's assertion that his canine simply would not make a mistake goes too far. As Justice Souter observed in his dissenting opinion in *Caballes*, "the infallible dog, however, is a creature of legal fiction." 543 U.S. at 411. In at least one study, dogs have been found to be very efficient at reading humans. For this reason, some groups, such as the Pacific Northwest Police Detection Dog Association, employ double blind testing that aspires to scientific levels of impartiality. Martin Kaste, *Eliminating Police Bias When Handling Drug-Sniffing Dogs*, (November 20, 2017, 5:01 A.M., https://www.npr.org/2017/11/20/563889510/preventing-police-bias-when-handling-dogs-that-bite.)

The circumstances of this case are akin to those of *Bell v. State*, 13 N.E.3d 543 (Ind. Ct. App. 2013). There, passenger Bell had been patted-down after an officer had detected an odor of raw marijuana on Bell's person, and the search yielded marijuana. This Court concluded that the officer "had no reason to believe Bell was armed and dangerous" but probable cause existed to make an arrest and conduct a search incident to the arrest. *Id.* at 545. Here, too, Trooper Miller had probable cause to arrest Curry based upon his actual or constructive possession of drugs; he conducted a lawful search incident to the arrest.

## Evidence Rule 404(b)

When he was arrested, Curry admitted that the seized heroin was his; he estimated its weight to be 100 grams; and he stated that he paid $8,000 for it. During a video-recorded jail interview with Officer Wells, Curry made some additional statements. He explained that the seized heroin had been "fronted" to him and his payment of $8,000 had included payment for two prior shipments. (Tr. Vol. III, pg. 145). Curry admitted that he had recently taken twice weekly trips to Chicago to procure heroin and he described his sales method – building up from a one-ounce sale to two ounces and finally to four ounces. At trial, Curry objected to the admission of his incriminating statements on grounds that Indiana Evidence Rule 404(b) was violated.

Indiana Evidence Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to

show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident…" The list of permissible purposes is illustrative but not exhaustive. *Hicks v. State*, 690 N.E.2d 215, 219 (Ind. 1997). "The well established rationale behind Evidence Rule 404(b) is that the jury is precluded from making the 'forbidden inference' that the defendant had a criminal propensity and therefore engaged in the charged conduct." *Thompson v. State*, 690 N.E.2d 224, 233 (Ind. 1997).

[37] In assessing the admissibility of Rule 404(b) evidence, a trial court must (1) determine that the evidence of other crimes, wrongs, or acts is relevant to a matter at issue other than the defendant's propensity to commit the charged act and (2) balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. *Vermillion v. State*, 978 N.E.2d 459, 463 (Ind. Ct. App. 2012). We review evidentiary decisions for an abuse of discretion, and will reverse only when the decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Nicholson v. State*, 963 N.E.2d 1096, 1099 (Ind. 2012).

[38] At trial, the State argued that Curry's statements did not concern acts extrinsic to the charged offense but merely explained his operation. Additionally, the State urged that Curry's statements were admissible under the intent exception of Rule 404(b). The intent exception is available in limited circumstances, as explained by our Indiana Supreme Court:

The intent exception in Evid. R. 404(b) will be available when a defendant goes beyond merely denying the charged culpability and affirmatively presents a claim of particular contrary intent. When a defendant alleges in trial a particular contrary intent, whether in opening statement, by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of prior crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense. The trial court must then determine whether to admit or exclude such evidence depending upon whether "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence." Evid. R. 403.

*Wickizer v. State*, 626 N.E.2d 795, 799 (Ind. 1993).

[39] Our review of Curry's statements to police indicates that he described his overall operation, while the charge against him targeted one delivery within that operation. To the extent that Curry described the quantity, price, and character of the seized contraband, and his reason for possession – anticipated sale – the incriminating statements did not deal with a prior bad act. To the extent that he admitted to other drug-couriering trips and described a method of sales (where trust was earned, that is, he started with small sales and worked up to four grams), Curry referenced extrinsic bad acts. This evidence was not properly admissible under the intent exception, as Curry did not "affirmatively present a claim of particular contrary intent." *Id.* at 799.

[40] That does not end the inquiry, however. Even when a trial court abuses its discretion in admitting evidence under Rule 404(b), "we will only reverse for that error if 'the error is inconsistent with substantial justice' or if 'a substantial right of the party is affected.'" *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind. Ct. App. 2004) (quoting *Timberlake v. State*, 690 N.E.2d 243, 255 (Ind. 1997)); *also* Ind. Trial Rule 61. Although Curry's testimony of other couriering trips and his sales methods should not have been admitted, his conviction will not be reversed if the erroneous admission of evidence did not affect his substantial rights.

[41] The State presented testimony that 100 grams of heroin was secreted in Curry's clothing. He readily admitted to the arresting officer that the contraband was his. Considering this evidence, we can confidently say that error in the admission of impermissible evidence was harmless error.

## Sentence

[42] Indiana Code Section 35-50-2-4.5 provides that a person convicted of a Level 2 felony faces a sentencing range of ten to thirty years, with the advisory sentence being seventeen and one-half years. Indiana Code Section 35-50-2-8 provides that a person convicted of a Level 1 through Level 4 felony and adjudicated a habitual offender may have his sentence enhanced by six to twenty years. Curry received a twenty-five-year sentence, enhanced by ten years, which he challenges as inappropriate.

[43] Under Indiana Appellate Rule 7(B), this "Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." In performing our review, we assess "the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell v. State*, 895 N.E.2d 1219, 1224 (Ind. 2008). The principal role of such review is to attempt to leaven the outliers. *Id.* at 1225.

[44] When considering whether a sentence is inappropriate, we need not be "extremely" deferential to a trial court's sentencing decision, but we accord due consideration to that decision, recognizing the unique perspective of the trial court. *Rutherford v. State*, 866 N.E.2d 867, 873 (Ind. Ct. App. 2007). Accordingly, a defendant "'must persuade the appellate court that his or her sentence has met th[e] inappropriateness standard of review.'" *Anglemyer v. State*, 868 N.E.2d 482, 494 (Ind. 2007), *clarified on reh'g*, 875 N.E.2d at 218 (quoting *Childress v. State*, 848 N.E.2d 1073, 1080 (Ind. 2006)).

[45] As for the nature of the offense, Curry had 100 grams of heroin in his possession with intent to deal. This is well beyond the amount required for conviction of Level 2 felony dealing.

[46] As to the character of the offender, Curry had a prior conviction for Class A felony dealing in cocaine, separate from the predicate felonies to support the habitual offender adjudication. He had a history of violating probation and had

been charged with a new drug-related offense by the time of sentencing in this case.

[47] Having reviewed the matter, we conclude that the trial court did not impose an inappropriate sentence under Appellate Rule 7(B), and the sentence does not warrant appellate revision. Accordingly, we decline to disturb the sentence imposed by the trial court.

# Conclusion

[48] The State did not obtain the physical evidence against Curry in violation of his Fourth Amendment rights. Error in the admission of evidence did not affect Curry's substantial rights. His sentence is not inappropriate.

[49] Affirmed.

Baker, J., and Altice, J., concur.